Tilghman C. J.
This is a question on a devise in the last will and testament of Dr. Andrew Ledlie, of Easton, in Northampton county. The difficulty is, to discover the intention of the testator, who drew the will himself, and by adding several codicils, has rendered his meaning, taking into view both will and codicils, not a little doubtful. Pie appears to have been a man of a singular mind, of a benevolent cast indeed, but tinctured strongly with vanity, and subject to violent passion. This is evident from the eccentric directions respecting his funeral, the plape of his interment, his tombstone, his epitaph, and the strong resentment expressed against a certain person whose name he has introduced into his will, without any intention of giving him a legacy. He had neither wife, nor lawful child, but at the time of writing his will, (8th January, 1791,) his affections seem to have been centered in an old house-keeper, and a natural child. He had near relations in Ireland, for whom he entertained but little regard, and they, as it would seem from some expressions of his, had shewn as little regard for him. Intend *371 ing to give his whole estate in Pennsylvania to his housekeeper and child, he expressed himself, in the will of Ja~ nuary, 1791, in terms sufficiently clear. “ As to my estate in Pennsylvania, or elsewhere, in America, both real and personal, I give and bequeath it' to Daniel Clymer and Robert Trail, esqrs. in trust, nevertheless, for the uses herein after-mentioned, that is to say, one equal half part to my old friend, companion, and house-keeper for the last 9,5 years, Eleanor Hunt; and the other half of my said estate, I give and bequeath to my natural son, John Ledlie; the survivor of either to possess the whole of said estate, either by will or otherwise.” Here is a plain intent to make the devisees tenants in common, (a moiety to each,) during their joint lives, and to give a fee simple ip the whole to the survivor of them. On the 81st October, 1793, a codicil was made, and it appears, that between the time of making the will and the codicil, the mind of the testator had experienced some change. His dormant affections had been revived, by letters received from some of his relations in Ireland. Having declared, in the preamble of the codicil, “that he had altered, in some measure, his intentions,” he goes on to say, “ I do make this codicil in alteration and addition of the within, viz. one thing was omitted in the before recited testament, of mention made, (as was intended,) in case of no legitimate heirs of the bodiés of the two legatees, or ere one of them, (that is the expression, meaning either of them,) that after his or her decease, it should revert to the heirs of my sister, Isabella Simpson, wife of the Rev. George Simpson, to be equally divided between them, who live near Armagh, in the north of Ireland, as of my next of kin who have deserved of me by writing, &c. lately, the others being provided for.” What did the testator mean ? Did he intend, that there should be cross-remainders between his house-keeper and son, so that his sister’s children should not come in for any part, until there was a failure of issue of both,the first devisees, or that as soon a? one should die without issue, the remainder of a moiety should go immediately to his sister’s children ? Considering the words of the codicil by themselves, without reference to any other expressions in the subsequent codicils, J should think the most natural construction would be in favour of an estate tail to each with cross-remainders in tail; and remainder to his sister’s children in fee. But another construction may be given, *372 without violence to the expressions; and from what was after-wards said by the testator, I incline to the opinion, that he has explained his meaning to be, that on the death of either of the first devisees without issue, the moiety of the one so dying should go at once to his sister’s children. On the 28th May, 1794, he made a second codicil. In this he mentions, that his house-keeper had unfortunately fallen into a habit of intoxication, and adds, “ I request my trustees to proportion her subsistence, which I wish and will to be not less than 12/. nor more than 20/. paid quarterly, or upon good behaviour, and her remaining 10 or 12 miles out of Easton, and that she or any other person or persons may be prevented from wasting my estate, as the reversion of the same is left to-my sister Isabella’s children, as per codicil of my former will.” On the 1st July, 1794, the testator made another and his last codicil, in which he says, “ I am willing to allow my housekeeper, Eleanor Hunt, one furnished room in the house I now occupy, during her natural life, and 20/. a year, if she behaves prudently, if not, to be reduced to 12/. a year, paid monthly, if required by her or order, but no part of the property of said room or monthly allowance, shall be disposed of by her, she being for the most part insane,” &?c.
I am far from being satisfied, that it was not the intent of the testator to reduce the devise to Eleanor Hunt, to a life estate at most, for she had no legitimate child, nor was it in the least probable, that she ever would have. But I think it may safely be concluded, that the testator had no idea of cross-remainders between her and his son. Her situation and his opinion of her forbid such a supposition. And when he says, in his second codicil, that the reversion of the estate was given to his sister’s children, I understand it, that he alluded to the reversion of Eleanor Hunt’s estate, because he h&d been just speaking of her. It is unnecessary to perplex ourselves with conjectures concerning the quantity of the estate yrhich it was really intended Eleanor Hunt should take, because that matter is immaterial to the plaintiffs. Whether she took an estate for life, or in tail, with remainder t© the children of the wstator’s sister, or in fee simple, with an executory devise to those children, on the contingency of her dying without issue living at the time of her death, is of no importance; because, having died without issue, the estate devised to her, is at an end. The only material question iss *373 whether on a fair construction of the will and codicils, there was an implied remainder to John Ledlie to take effect by way of cross-remainder, immediately on the expiration of the estate of Eleanor Hunt. If he had such a remainder, Eleanor Hunt must have had a like remainder on the expiration of his estate. But this, I think, cannot be supposed to be in accordance with the will of the testator. Cross-remainders are not favoured in law, nor are they implied, but from necessity. Here, they are not expressly given, and to imply them, would not only be without necessity, but against the mind of the testator, not expressed indeed, but sufficiently implied. I am, therefore, of opinion, that there were no cross-remainders, but that on the death of Eleanor Hunt, without issue, her moiety of the estate of Dr. Ledlie went immediately to the children of his sister Isabella, to be equally divided between them in fee simple. The judgment of the Court of Common Pleas must, therefore, be reversed, and a venire facias de novo awarded.
Gibson J.
The intention of the testator must prevail, but particular rules of exposition are established, by which we are to arrive at it. The real intention can seldom be ascertained; it can in most instances be but guessed at, and not being known, it is impossible to execute it. Such, beyond question, is the case with respect to the will under consideration. It is therefore better on the score of policy, to adopt even an artificial process of reasoning, that will afford certainty of result, than, by abandoning all rule, to introduce the uncertainty of decision and consequent insecurity of title, that would ensue from the blind gropings of the most acute mind. Nor would we be more likely to reach the actual intention by being unfettered by rules ; but on the other hand much as to certainty of decision would be lost. In the present case it appears the testator was unacquainted not only with the meaning of technical words, but even with the force and necessary arrangement of the most common words in our language; and therefore little will be gained, by abandoning technical meaning, to enquire after the actual intention, when the testator understood the language of common parlance, little, if any better, than technical language. It will be impossible to give a sound legal construction to this will, and its several codicils, or ascertain the force and *374 meaning of any particular expression, without referring to the whole, as an entire instrument. I shall therefore consider the will, and the codicil of the 31st October, 1793, together, and then enquire, whether there has been any new disposition by the two last codicils, affecting the question before us. Now in the will, the intention of the testator is clearly and unequivocally expressed, that the survivor of the two immediate objects of his bounty, should take the whole estate, and nodisjoinder is contemplated j this is as clear as words can make it. But by the codicil, it is limited over to the plaintiffs, “ in case of no legitimate heirs of the bodies of the two legatees or ere one of them” I admit the kind of failure of heirs the testator had in view is not very explicitly described. He employs for that purpose two distinct clauses, each of them susceptible of a double and opposite meanings “ In case of no heirs of the body of the two” may mean, that the estate shall go over at the death of one, unless both shall have issue living, for if but one had issue it might with propriety be said there were not heirs of the bodies of both, or as he expresses it, the two; or it may mean a failure as to each, in which case the expression would be equally satisfied j for it could not be said there were no heirs, if either had issue. So of, the second clause; in case of no heirs of the. body “ of either of them,” is satisfied if either be without heirs ; and it is not satisfied if either have heirs, for it cannot be then said there are no heirs of either, or as he expresses it <<■ ere one of them.” The meaning is entirely changed by changing the emphasis. Nothing is therefore gained by analysing the language, which is always an unsafe and unsatisfactory means of arriving at the intention. Effect is to be given, if possible, to every expression in a will, and hence it is argued, but without force, that the testator must have meant to express by the second clause something different from the first, or he would not have used it, and meant to express that the estate should go over on a failure of issue of both or either. But if he intended a part to go over on a failure as to one, it would have been unnecessary to make provision for a failure as to both. In all cases where similar expressions have been used, cross-remainders have been raised; as in the case put in Cole v. Livingston, 1 Vent. 244, of a devise of Blackacre to A, Greenacre to B, and Whiteacreto C,and if they die with- . out issue of their bodies, vel alterius eorum; it was said by *375 reason of these latter words there would be cross-remainders. This is precisely our case, except the number of the bodies from which the issue is to spring, is not expressed ; but that. is altogether immaterial to the sense. So in an anonymous case in 3 Dyer, 303, b. devise to five, and the heirs of their bodies, and if they allfive should happen to die without issue male of their bodies or any of their bodies, then over; and it was held to be a case of cross-remainders. This is a stronger case than ours. But independent of authority, there is one thing in this codicil that lets us into the intention, and which governs the construction,-and determines the meaning of every expression in it. It is this; the very same arrangement he afterwards made by this codicil, he intended to insert in his will, for he expressly says he then had in- view the very .same limitation to the plaintiffs. The codicil itself is ushered in with the declaration that, “ one thing was omitted in the before recited testament of mentipn made, (as was intended,) that in case of no legitimate heirs, &c. “■ of the two devisees, &c.” then follows the devise to the plaintiffs. Now nothing can be clearer than that the survivor of the two immediate devisees, in case of failure of issue, was by the will -to have all. Then we have his declaration, he did not, by this codicil mean to make any new disposition of his property inconsistent with the will, or to alter any part of it, but to complete the arrangement he originally had in viezv, a part having been omitted by. an oversight. This he has declared, not in terms, but substantially; unless we are to suppose, that, at the time of making his will, he intended that it should contain two dispositions of the same property, not only inconsistent with, but diametrically opposite to each other; a thing not to' be. credited. By the will there is an explicit declaration of intention, that the whole estate is be united in the person of the survivor. By the codicilj an estate tail is vested in the immediate devisees by implication, and if the part of the person first dying withodt issue is to go immediately over, it is certain the provision in the will must he defeated. If then the testator,, when he made his will, had in view to provide for the plaintiffs exactly as he afterwards did by the codicil, and if the latter cannot, as he tells us, be referred to an intervening change of intention, must not its construction be subordinate to., and. governed by the prevailing object of the .testator when' he made his will, *376 which was to give the whole estate to the survivor of the two immediate devisees, in case the other died without issue. Would not that be the construction, if the provisions of' the codicil had been originally embodied in the will? In that case certainly no implication would prevail against the express direction of the testator; I therefore prefer giving the same meaning to both clauses that describe the contingency. I consider the last as redundant, and intended to express what had been sufficiently expressed before. The time also when the limitation over is to take effect must be governed by the same consideration; “ his or her decease” must mean, not the decease of the party first dying without issue, but that of the survivor as the event should turn out, and thus the will and codicil, will be rendered consistent with each other, as the testator all along intended they should be. In fact any other construction would seem to oppose the evident actual intention. The words of the codicil are, in case of no legitimate heirs, &c. that after his or her decease, it should revert to the heirs of my sister Isabella, to be equally divided between them, &c. who deserve by writing lately, &c.” What is here referred to by the relative word “ it It would do violence to a grammatical rule of construction to say it is a part of the estate. The word relates to something said before in the will, which for this purpose, is to be taken in connection with the codicil. The last antecedent, and that to which this word must refer, is. found in the last clause of the will, and by that the testator speaks of the whole estate; the word therefore refers to the whole estate. Nor is there any thing to induce a doubt of this being in accordance with the actual intention, but on the contrary, something to make us think it strictly so. With respect to a division, as between the first two devises, and also between the present plaintiffs, the testator is studiously explicit; but as to a separation of the estate as concerns its going over, he seems intentionally silent. As to his saying, the plaintiffs deserved by writing lately, it cannot be inferred from that, he intended to change the dispositions in the will, for he tells us he did not. These letters of enquiry again directed his attention to the will, and led to a discovery of the omission to provide for the plaintiffs as he originally intended, and this Was supplied by the codicil, but we cannot infer that they had any other effect. It is however argued, that the estate being *377 given by moieties, the devisees were tenants in common, and that a disjoinder of their interest is inconsistent with the presumption, that cross remainders were intended; a necessary and irresistible implication, being, it is said, essential to create them. But a disjoinder of the estates as between the first takers is no further material than as it may seem to indicate a severance of the inheritance, and we find instances of cross remainders being implied, not only between tenants in common, but even where the possession was several, as in the case put in 3 Blac. Com. 381. The case in Cro.Jac. 635. which says, ci'oss remainders cannot be implied, where the first devisees take in severalty, is, I apprehend, not law; the severance must be continued throughout. They may be implied between any definite number, and the rule is, that where they are to be raised between two and no more, the presumption is in their favour, but where between more than two, it is against them; but the presumption either way, may be rebutted by circumstances of plain intention inconsistent with it.
Then as to the operation of the two last codicils. It is argued, that however the matter might stand on the will and first codicil, the devise to Eleanor Hunt, is revoked by the remaining codicils. If it were so, I am not quite sure it would affect the question. Cross remainders in tail, limited after a preceding estate tail, are not contingent, but vested. It might therefore be, that the destruction of Eleanor’s estate, would not defeat the remainder in tail limited to John Whether the devise of an interest by the description of a remainder would be void, because the testator had revoked the devise of the preceding particular estate, thus leaving at his death,no remainder for the words of the devise to operate on, it is unnecessary to determine; for there is no reason to say these latter codicils revoked any thing. There are no express words; and revocations arising from inconsistency of disposition, will not be admitted except where the inconsistency is plain and unavoidable. The latter codicils contain a personal modification of the devise as to Eleanor, and nothing more. She is still to have an estate of inheritance, but is to be restrained by the trustees from committing waste, and she is limited to a partial perception of the profits. This restriction was applicable to her personally, and would not have affected her issue, if she had left any. Was this incon *378 sistent with her having an inheritable estate? Where lands are devised to A, and afterwards by the same will, to B, they will be made joint-tenants, rather than the latter part should be esteemed a revocation of the former. I confess, I would be inclined to strain the construction, if that were necessary to give Eleanor an estate of inheritance, rather than deprive John Ledlie, of the remainder, as I feel convinced it v/as the intention, that no part of the estate should go over, while issue of his remained. He was the testator’s natural son, and the principal object of his bounty; and it would have been unnatural to exclude him, in favour of the testator’s more remote kindred. No inference of intention can be drawn from the advanced age of Eleanor, and the little probability there was of her having issue. We do not know hei? age, but she had been the house-keeper of the testator for twenty five years, and although it may not be probable she was capable of procreation, still there was no impossibility in the way. Women have borne children when considerably in advance of fifty. But it is clear the testator thought she might have issue; else why provide, as he certainly did, for an event he knew could never happen. This supposition on his part, whether well or ill founded, is sufficient for every purpose of explanation as to his intention and motive, for giving her an estate of inheritance. I therefore think her, age and infirmities cannot be called in aid of the argument, that the devise to her under the will and the first codicil, was revoked. The two latter codicils contain a modification of her right of enjoying the estate, but a modification, not extending to her issue, or changing the nature of her interest. But reliance is put on the direction in the codicil, of the 28th May, 1794, requiring the executors “ to take care that she or any other person may be prevented from wasting the estate, as the reversion of the same is left to my sister Isabella’s children, as per codicil of my former will” and it is inferred, this clause indicates an intention, that Eleanor’s portion of the estate, should go over immediately on her death, as the estate was to be preserved for Isabella’s children, without saying a word about its being preserved for John Ledlie. But here again the meaning is made manifest, by a reference to something said before. If the first codicil is not inconsistent with the provisions of the will, (and I trust I have shewn it is not,) neither is this. The estate is to go *379 to Isabella’s children; but how? “ as per codicil óf my former will.” He did not intend it to go differently from what he formerly directed, and this codicil, instead of being a key to the first, must itself receive an explanation from it. But it would have been absurd in the testator to direct the estate to be preserved for John, or any body else but the plaintiffs ; for Eleanor might have outlived John, and he could only take, in the event of surviving her, which was altogether uncertain. If the direction had related solely to Eleanor’s portion, there would be more force in the argument, but it related to the whole of the estate, and to John Ledlie, as well as her, How can we infer, then, the testator had in view, the event that has since happened, the death of Eleanor without issue, in the life time of John, and that he meant to provide for it. I view this clause as a general direction to preserve the estate as it was, ultimately to go to the plaintiffs, the only persons in whom a remainder would certainly take effect in possession. It is clear that in no other part, is there any thing that serves to point them out as the objects -of the testator’s Immediate bounty. Of so little concern was their interest, that it was entirely overlooked in the will, though the testator tells us, he intended from the first to provide for them in the way he ultimately did. Giving its fullest force to the declaration of the testator, that the reversion was left to the children of his sister Isabella, it can give rise only to a suspicion that he intended they should have Eleanor's part at her death, and is not sufficient to outweigh the positive declaration in the will uncontradicted in every other part, that the survivor of the two immediate devisees should have the whole. I therefore do not consider the two last codicils as contradicting, or even explaining in any respect, the disposition of the estate, by the will and first codicil.
I am of opinion, John Ledlie, and Eleanor Hunt, took estates tail by implication, with cross remainders in tail, remainder to the plaintiffs in fee; and that therefore, the judgment should be affirmed.
Duncan J.
This controversy arises on the will and codicils of Dr. Andrew Ledlie. In giving a construction to this very obscure testament, the will and codicils are to be conjointly considered as one entire disposition. 1'hey are all the work of the testator; the declarations of his intention, as *380 new ideas started up in his mind, as events arose requiring in his opinion a modification or alteration of his original plans. Whatever that intention was it must prevail; the difficulty is in ascertaining it; when ascertained, there is no legal impediment to give it its full effect.
“ As to my estate in Pennsylvania or elsewhere in America, both real and personal, I bequeath to Daniel Clymer and Robert Trail in trust, nevertheless, for the uses hereinafter mentioned, that is to say, one equal half part to my old friend, companion, and house-keeper for the last 25 years, Eleanor Hunt; and the other half of my said estate I will and bequeath to my natural son John Ledlie, son of Bridget Butler, the survivor of either to possess the whole estate by will or otherwise.” This will bears date the 8th January, 1791. Did it stand on the will alone, Eleanor Hunt and John Ledlie would be tenants in common in fee with the benefit of survivorship. On the 31st October, 1793, the first codicil is executed, in which he declares as follows : “ One thing was omitted in the before recited testament, of mention made (as was intended) in case of no legitimate heirs of the bodies of the two legatees or ere (either) one of them, then after his or her death, it shall revert to the heirs of my sister Isabella Simpson, to be equally divided between them as my next of kin, who have deserved by writing, &fe. the others being provided for.” This codicil is not free from doubt. It is contended by defendant, that the benefit of survivorship was conferred by the will, and that the testator on re-perusing his will confined this to one event; the dying without issue; thus providing for the issue of each devisee; this was the omission intended to be supplied by the codicil; and that by the will and codicils taken together Eleanor Hunt and John Ledlie, become tenants in tail; and that they took by way of cross-remainders ; that on the death of one without issue, it would go to the person surviving; and that on another event, the death of both without issue, it would go to the heirs of Isabella Simpson. On the other hand, it is contended, that here were other objects of the testator’s bounty intended to be provided for; his sister’s children, his next of kin who had deserved provision; as all his other next of kin had been provided for; and that on the death of any one of the first takers without issue, the part of such one, on his or her death, was to go over to his sister’s children. But op *381 the 28th May, 1794, there is another codicil,—“ In addition and continuation of my former will and codicils, I do authorise and request my good friends Daniel Clymer and Robert Trail, on account of an unfortunate intoxication of my housekeeper since the said will, that they would jointly and severally proportion her subsistence, which I will not to be less than 12/. nor more than 20/. per annum, payable quarterly, or on good behaviour, she remaining 10'or 12 miles out of Easton; and that she or any other person may be prevented from wasting my estate, as the reversion is left to my sister’s children.” This codicil gives a strong view of the testator’s intention ; it is his own construction of his own writing. And again, on the 1st July, 1794, he adds a third codicil,—<c I find myself further under the necessity of reminding my trusty friends, Daniel Clymer and Robert Trail, of the situation of my affairs. I am willing to allow my house-keeper, Eleanor Hunt, one furnished room in the house I now occupy, during her natural life, and 20/. a year if she behaves prudently; if not, to be reduced to 12/. per year, paid monthly ; but no part of the property in the said room is to be disposed of by her, she being for the most part insane.” The testator died in January, 1795. Eleanor Hunt died a few days after him, without issue. John Ledlie, or John Butler, as he is called, is still living. :
The plaintiffs in error contend, that by these two last codicils the will is revoked, and other provisions substituted; and that she has, out of that part of the estate devised her by ' the will, certain privileges and allowances during her life ; and that the estate devised to her was to remain in the hands of the trustees during her life, and on her death was to be delivered over by the trustees to them, unimpaired by waste.
A codicil, unless it contain express words of revocation, is no revocation of a preceding will to which it is applicable, except precisely in the degree expressed, leaving the particular dispositions unaffected thereby, as well as the instrument in all other respects precisely in the same state in which it finds them. Poxv. Dev. 544. A codicil inconsistent with a preceding will, is in law a revocation of it. Ib. 542. A codicil being considered as part of the will, and taking effect with it at the death of the testator, is in its own nature not intended to be a revocation of the will or of the particular dispositions thereof, further than as specifically altered thereby. Is the *382 devise to Eleanor Hunt specifically altered ? The inclination of my opinion is, that there is a specific alteration; how far, or what its effect may be on the interest of John jjs to be considered. The situation of Eleanor Hunt was deeply impressed on the testator’s mind. Whatever his views were as to her in January, 1791, when he executed the will, or in October, 1793, when he added the first codicil, in May and July, 1794, when he added the second and third codicils, they were totally changed on account of the intoxication and imprudence of his house-keeper, for the most part amounting to insanity. Instead of one-half of the estate, she is to have no estate, interest, or power of disposition of any thing; a bare subsistence; 12i. or 20/. depending on the discretion of the trustees; restrained as to her place of abode by one codicil j a furnished room, by another, during life, without the power of disposal; the small pittance allowed her she is prohibited from disposing of. It is inconsistent with the whole scope of these codicils and of the testator’s manifest intention, that she should be tenant in tail of one-half of all; the small provision depending on her good behaviour; the restraint as to her abode; the furnished room for life ; the power denied her on account of her insanity to dispose of an article of the smallest value; all these unite to shew, that the testator did not intend that she should have either interest, power, or authority over, in, or on account of any part of it; much less, that on the death of John Ledlie, without issue, she should have the whole. By the will, she would be tenant in common with John Ledlie in fee of the whole estate ; by the first codicil tenant in tail; by the second and third she is restrained to the possession of one room for her life, of his whole real estate. All this is totally repugnant to the will and first codicil. Great and important changes are introduced totally incompatible therewith. I never can believe it was the intention of the testator, that she whom he had thus cut off, for the special reasons assigned by him, from all but the specific provision, should have the disposition of one-half the profits ,of the estate and its management, and that in one event, she should become mistress of the whole. She was executrix under the will. Did she remain so under the two last codicils ? She is represented by the testator as unworthy of all confidence ; unfit to be trusted with the care of any thing. Shall she yet remain, incapable and insane as he has declared *383 her, an executor of his will? When the testator made the two last codicils, it was not in his view to provide for the issue of a drunken, insane, unmarried, old woman. What then was the intention of the testator with respect to this-portion of the estate ; what was to become of it during-her life ? The trustees were to take care of it; were to support her; and on her death were to deliver it over, without waste, done or suffered, to the children of Isabella. The devise to the trustees was not revoked, but the uses and trusts were changed; to them in trust to make the allowance, &c. for the support of Eleanor Hunt; on her death to be delivered.to Isabella Simpson’s children. This construction may, ás I believe, be fairly drawn from the general tenor of the will, and would best effectuate the general intention of the testator. He expressly declares in his first codicil, that he has altered his intention from certain circumstances happening since the making of his will, and in terms revokes the provisions in his will altered by the codicil. But if doubts are entertained as to this, and if the will and first codicil remain unrevoked as to- the disposition to her, does John Ledlie on the death' of Eleanor Hunt take by cross-remainder ? This js matter of mere intention. One can receive little aid from books on this very obscure will. Cases might puzzle and perplex, but cannot enlighten our path, in the endeavour to discover the real intention. of this testator; there are no technical rules, or construction oflegal terms to stop our inquiry; every word, must be weighed to come at the intention. “ In case of no legitimate heirs of the bodies of the two legatees,” would by necessary implication create cross-remainders as between them. If such had been the testator’s intention, there would have been no occasion for further explanation; but fie has thought proper to explain this ; for he adds the-alternative, “if one of them die without legitimate heirs, it shall revert my sister Isabella’s, heirs.” If the wórd, or, is allowed to have been used in it? proper sense, indicating clearly some alternative in his contemplation, what is that alternative ? If it were omitted, it would clearly appear from the context, what that alternative was, viz. the death of either, without legitimate heirs of the body. But the alternative is clearly expressed; or any of them shall so die, on his or her death it shall, revert that is, on either event, viz. the death of both, without heirs of the body, or any one of them without heirs of his or *384 body. A difficulty is suggested as to what part shall go over. On reflection this vanishes. If both die, the whole shall go over; if anyone of them, the part of him or her dying, on his or her death, shall go over. This reading of the will makes it natural and intelligent throughout. This is not an unauthorised liberty taken with the will, for in Spalding v. Spalding, Cro. Car. 185, where a man having three sons, John, Thomas, and William, devised lands to John and the heirs of his body, after the death of Alice, the testator’s wife ; and if John died, living Alice, that William should be his heir; and the Court then, from the apparent general intent, supplied after, “if John should die,” the words “without issue,” so as to vest the remainder in William, on John’s dying without issue, living Alice. So in Fonereau v. Fonereau, 3 Atk. 315, where the testator left 54,000/. to be paid to his children, share and share alike, and after their decease, the principal equally among their issue, and in case all the issue of any one child should die before twenty-one, the share of such child to be divided among the surviving children of the testator, Lord Haudwicke held, there could be no reason for a devise over in the case of the issue of a child dying, and not in the case of a child itself dying without issue ; and decided it should go over, supplying the words giving over the share of a child who had no issue. These cases are stronger, for in them the structure of the sentence was pérfect, without any alteration or addition of words. It was observed in that case, that people frequently differ in expression, though they mean the same thing, and it would be construing wills by too great a nicety, to lay weight upon strict form of words, where the meaning is plain. The codicil of May, 1794, affords us the testator’s own construction. It appears by the first codicil, that these plaintiffs had lately become the objects of the testator’s bounty. As they were deserving and unprovided for, the testator intended, and declares his intention, to make some provision for them. The death of an ancient unmarried woman without heirs of her body, would be an event the testator contemplated must happen in a very short period. This would afford in some short time a certain provision for them, but it would be nothing to provide for them on an event not likely ever to happen, and which, even did it happen, the probability was it would not afford them any provision; the death of John Ledlie? a young man and -an *385 indefinite failure of issue, it was making a promise to the ear and breaking it to the hope it would indeed be precarious and illusory. With the unprovided state of these children ■ in his eye, how anxiously does he guard their interest ? The trustees are enjoined to prevent it from being wasted ; why 1 Not because it was to remain to John Ledlie, his natural son, but because the reversion, the word here used by the testator as remainder, was left to his sister’s children; of what ? of the part devised to Eleanor Hunt. I never can consider this as a remainder depending on the death of both without issue. Why, if John was the remainder-man intended, not so express it ? He Certainly considered not John as the person who would be immediately injured by waste ; it never could be his intention to provide here for a remote remainder and pass on in silence a remainder which he knew must take place shortly after his own decease. Although I do not know that any precedents can shed light on the intention of this testator, as no will ever used the language employed by him, and as no rule can be drawn from other wills on a construction simply of intention, further than as they give us the opinion of learned men on the natural construction and import of words and the structure of sentence's; as such they are to be considered with respect; but where a case is not cited for the sake of some principle or rule, but to shew certain expressions cannot or must not have this or that construction put upon them; such cases can only rule other cases where the subject matter of construction is not to be distinguished. In cases where technical language is used a course of decision on the, nature of the estate devised, must be submitted to as binding, otherwise there would be an end of all certainty and all depend on the arbitrary construction of Courts. The leading cases are collected in Williams’s note to Cook v. Gerrard, 1 Sound. 185, note 6. All of them depend on the use of particulfir expressions denoting an intention, that the whole shall go together ; and at the same time they one and all, establish a separation of the parties or of the remainder over on the death of any one of them, and the presumption of cross-remainders is rebutted. It is on this principle the case of Wright v. Holford, Cowp. 31, was decided. The certificate of the King’s Bench, to the Chancellor, is strictly expressed to this effect; “there are no words in the will which intimate any intention to limit over the respective *386 shares of the two daughters dying without heirs of their bodies respectively ; on the contrary the limitation over is of the whole estate limited to all the daughters, and is to take place on the failure of all and every the-daughter and daughters, and the heirs of their body and bodies, and the limitation over for default of such issue is to the heir at law; consequently, we are of opinion, that as nothing is given to the heir at law whilst any of the issue remain, they must among themselves take cross-remainders.” Most of the cases which have been decided to raise cross-remainders by implication, as was observed by the Court, have been in favour of the heir at law, and to prevent the estate going over to strangers. “ Or any of them,” leave the children of Isabella to wait till the death of both without issue. However it might stand on these words alone, according to the cases, 4 Leon, 14, and 1 Vent. 224, I do not say but here by the force of the words, on his or her death without legitimate heir of the body, the ultimate limitation is not to vest on the death of both devisees, but on his or her death. Here then was something to revert on the death of one of them; all was not to go over at the same time. But even if it were doubtful, as is stated in Comber v. Hill, Hardw. c. 22. 2 Str. 969, by Lord Hardwicke, cross-remainders are not to be presumed. No case can be cited where cross-remainders have been raised by the words in default of such issue, for they may be as well understood distributively as' conjunctively, and the Court cannot raise cross-remainders by implication where words are indifferent one way or the other, and had the words been for default of such issue respectively, there would have been no colour of argument for cross-remainders-. The devise there was, the whole premises to Richard his son for life, remainder, to his first and every other son and sons in tail male and for default of such issue to his grand-son Richard Holden, the son of Thomas Holden, and to Elizabeth his grand-daughter, equally to be divided, and to the heirs of their respective bodies, and for default of such issue to his granddaughter Ann Holden in fee. The doubt arose on the words, for default of such issue. The Court said, we must see what goes before ; to my two grand-children Richard and Elizabeth, equally to be divided, and the heirs<of their respective bodies. Now the word respective is what such, may very naturally refer to, and then it means, I give one-half to my grand *387 son, and the other to my grand-daughter, and for default of such issue respectively, I give the same to Ann, i. e. the same respective part that the person dying was seised of; otherwise the word respective- must be 'rejected ; where as it stands in this will, it will have the same operation, as if thé devises had been by separate clauses. Clearly the words in this will, aré', in default of-such issue respectively; if they die, or any one of them die without heir of the body, on his of her death, signify respective issue, respective deaths. The case in Leonard, is distinguished from this. There was the unnat.uralness of giving the estate from his own children, and the word whole could not be used Without raising cross-remain-' ders. ' I have weighed again and again, every word in this will, and the codicils. I have endeavoured to give to-every word its full operation. I do n.ot take a word here, and a word .there, on which to form my opinion, but I consider the whole scope; the original plan; the alterations; and all the objects of the testator’s bounty. My mind has settled on this conclusion; that there is not such a necessary or satisfactory implication, that cross-remainders were intended by this testator, as to justify me in-saying, that it was his intention to create them. I cannot adopt the construction of the defendant in error, of the words, and in case of no legitimate heirs of the bodies of the two legatees, or any one of them, that after his or her death, it shall revert to the heirs of Isabella Simpson; he read the clause as they do, in case ©f no legitimate heirs of the bodies of the two legatees, or in case of no legitimate heirs of the body of any one of them, then on the death of him or her who survives, the whole shall revert to my sister’s children; because the testator has expressly stated alternative events on the háppening of either of which, the remainder is to take effect; on the"decease of both without legitimate heirs, the whole of the estate, on the death of any one of them without legitimate heirs, the parts of him or her so dying without heir of his or her body, it, that is, such parts, shall go over. But if I doubted of this construction; I would invoke the aid of the second codicil, the construction and explanation given by the testator. Eleanor Hunt or any other person is not to be permitted to waste my estate; as it reverts by my will and codicil, to my sister’s children; for if the whole on her death, was to vest in John Ledlie, how could th,e trustees prevent him from committing waste. This injunc *388 tion on tbe trustees could never constitute an event which was to take place after an indefinite failure of issue, the extinction of unborn generations. The remainder over to Isabella’s children, was to take effect on the death of either of them, if either of them died without issue, marks the time when the remainders over to her children take effect in possession, as in Chadock v. Cowley, Cro. Jac. 695. If John Ledliehzá died without issue, leaving Eleanor Hunt, then Eleanor Hunt, would certainly have been entitled to the exclusive possession and enjoyment of this part of the estate, instead of the enjoyment and occupation of the room in the house, and the 12/. or 20/. at the discretion of the trustees. The devise is of real and personal estate. The personal estate then would certainly be in her power, so far as relates to the moiety coming to her, at the death of John Ledlie. The trustees would have no power to take possession of this moiety of the real or personal estate; they would have no power to prevent her from committing waste of it, or using it, directly in contradiction to the express declaration of the testator, that she should not have the use, or possession of any thing, except the pittance for her support, depending on her good behaviour; a bare subsistence, to use his own words.' The devise then, taking the whole together, is of separate interests, to John Ledlie, and Eleanor Hunt, and the heirs of their bodies respectively,of such separate interests; creating estates tail in them respectively, and the respective heirs of their bodies, in these separate and respective estates; and if both of them die without such heirs, remainder over of the whole estate to Isabella Simpson’s children, or if ere one of them die without such heirs, on his or her death, such separate and respective interest and estate, in like manner shall go over.
Although the law is as stated, that cross-remainders maybe presumed between two, yet the presumption must be necessary, at least probable; but all this doctrine is now settled on principles of common sense; - it is matter of intent to be collected from the whole will.
I am therefore of opinion, that cross-remainders cannot be implied but to John Ledlie, and Eleanor Hunt, and that the moiety devised by the will to Eleanor Hunt, on her death without issue, vested in the plaintiffs, and that judgment be reversed.
Judgment reversed.