### Lessee of KYLE *against* WHITE and another.

*Saturday,*
*January 2d.*

An improvement made on lands not purchased from the Indians, does not vest a title from its date.

A survey on what is called a *shifted location* is good against a person who had notice of it before the commencement of his title, even though the survey was not returned. It is no objection to a survey made before the year 1767 on lands purchased from the Indians in 1754, that 562 acres were surveyed upon two warrants for 100 acres each.

THIS cause, which was an ejectment for lands in *Mifflin* county, was tried before Judges YEATES and SMITH upon the spring circuit of 1803, and a verdict found for the plaintiff against the charge of the court. A motion was made for a new trial and a rule to shew cause granted, which it was agreed by both parties should be argued in bank; and accordingly it was now argued by *Watts* and *Duncan* for the defendants, and by *Dallas* and *C. Smith* for the plaintiff. The case and the arguments are so fully stated in the opinion of the Chief Justice, that it becomes unnecessary to make any additional note of them.

TILGHMAN C. J. This cause was tried at a Circuit Court in *Mifflin* county in *May* 1803, before Judges YEATES and SMITH, when a verdict was found for the plaintiff. A motion was made for a new trial; and it was agreed by the counsel on both sides that the case should be argued in bank.

It appears that in the year 1749 *William White* deceased, under whom the defendants claim, was settled on part of the land in dispute, which at that time had not been purchased by the proprietaries of *Pennsylvania* from the Indians. In the same year *Richard Peters*, secretary of the land office, went by order of the government with some magistrates, to turn off those persons who had settled on the unpurchased lands on the *Juniata*, whose residence in that country had given offence to the Indians. *White* agreed to move off; and in recompense of his submission to the government, *Peters* promised him that when the land should be purchased by the proprietaries from the Indians, his place should be secured to him. We find that in the year 1754, before the purchase, *James Kyle* was settled on the tract in dispute, not far from the improvement of *White*, and that in the spring of the year of *Braddock's* defeat (1755) he received notice of *White's* claim. The proprietaries made a purchase from the Indians, including this land, in the year 1754; and in 1755 the land office was opened for the sale. On the day of the opening of the land office (3d *February* 1755) *William White* obtained two warrants for 100 acres each; one to include his improvement on which *Kyle* had settled, the other to the northward of the first mentioned tract, and to include part of the *Big Meadow*. On the 28th of *November* 1760, a survey of 562 and a half acres was made for *White* by *William Lyon* for Colonel *Armstrong*, which was returned into the surveyor general's office *November* 8th 1766. In 1763 the office of Colonel *Armstrong* was burnt and all his official papers; which probably occasioned the delay of the return of this survey, by leading to a belief that it was destroyed by fire, though in fact it was not.

On the 3d *June* 1762, *Kyle* took out a warrant for 100 acres *adjoining William White*, and not making any mention of his own improvement; he had entered a *caveat* 17th *May* 1762, against *White's large survey*.

In *July* 1765 the dispute between *Kyle* and *White* was heard before *William Peters*, secretary of the land office, who decided

1808.

Lessee
of
KYLE
*v.*
WHITE.

that after *William White's* two warrants should be executed, and accommodated with a reasonable and full share of the survey made by *Armstrong*, the remainder should go to the satisfaction of *Kyle's* warrant.

*October* 23d 1765, *Kyle* took out another warrant for 200 acres, *including his improvement*, to pay interest from 1st *March* 1755.

*June* 30th 1768, *Kyle* and *White* were heard before the board of property, who decided that *Kyle* should have 225 acres out of *White's* survey, and *White* should keep the remainder.

*July* 20th 1768, two surveys were made for *Kyle* on his two warrants, one containing 106 acres, the other 111 acres.

*September* 22d 1766, *Kyle* obtained a conveyance from *George Gabriel;* but it does not appear at what time *Gabriel* was settled on the land.

*April* 16th 1755, *William White* conveyed his right to *John Calhoun*, who devised to his wife and children. His son *John* brought an ejectment against *James Kyle*, which was tried in the Court of Common Pleas of *Cumberland* county (*a*) *April* 1770, when a verdict was found for the plaintiff. *Kyle* then brought an ejectment against *Calhoun*, which was tried at Nisi Prius *May* 1773, and a verdict found for the defendant; so that two juries have found in favour of the title of *White.*

It appears then that both *Kyle* and *White* claim under ancient improvements; but that of *White* is the most ancient. Neither of them, however, can derive title from the date of their improvements, because they were made *against* law, on lands not purchased of the Indians. *White* had an equitable claim under the promise of Secretary *Peters*, which the proprietary officers always recognised. *White*, besides having the advantage of this equity, has the oldest warrant and survey. How is his title to be impeached? It is said that he included too much land in his survey, and that one of his warrants called for the Big Meadow, which is a mile or two distant from his survey. It is also said that his survey was not returned till 1766.

The delay in the return of the survey is well accounted for, by the burning of Colonel *Armstrong's* papers, and the Indian war in which he took a very active part.

(*a*) Mifflin county was erected into a separate county by act of Assembly 19th September 1789, out of parts of Cumberland and Northumberland counties.

1808.

Lessee
of
KYLE
v.
WHITE.

In considering the objection as to the quantity of land, we must advert to the time when the survey was made. If made at *this day*, the objection would be decisive. But in the year 1760, when it was made, it was customary to include much larger quantities than the warrants called for. It was not till 1767, that this practice was altered by instructions of the Governor to the surveyors. Now *White* ought not to stand in a worse situation than others, because he had obtained a promise from *Richard Peters*, that his place should be secured to him; and what strengthens his case very much, is that his survey was made before *Kyle* took out his warrant. *Kyle* too had notice of *White's* survey before he took out his warrants, for he entered a *caveat* in *May* 1762. This circumstance answers the objection that the survey is laid partly on land not called for; because in case of a survey on a *shifted location*, it is good against a person who had actual notice before the commencement of his title, even although the survey was not returned.

It is of great consequence that there should be uniformity of decision on titles to land. It appears to me, that the verdict in this case is contrary to those principles which have been heretofore established; and it is a circumstance of considerable weight, that the plaintiff after two verdicts and judgments against his title, acquiesced for the length of seventeen years, before he brought the present action.

I am of opinion there should be a new trial.

YEATES J. and SMITH J. concurred.

BRACKENRIDGE J. stated the titles as before, and then proceeded: The accommodation of settlers, and the improvement of the country, would seem to have been the early policy of the proprietaries; and it appears in the usage of the office in granting lands in small quantities, except in cases of special favour for special reasons. The indulging or accepting surveys for more than the quantity in the warrant, was under the idea that the settler was not able at once to take out a warrant for more. Where the warrant was not taken on a settlement, there was not the same reason to call for the indulgence of the proprietary.

*White* had two warrants for one hundred acres each, and there would be good reason to indulge him in a survey of three

2 I

1808.

Lessee
of
KYLE
*v.*
WHITE.

hundred acres, which then or since had become usual. But here were five hundred and sixty-two and a half acres surveyed, that is, two hundred and sixty-two and a half beyond what the warrants called for.

But although the proprietary might indulge, it was still a bare matter of indulgence or courtesy; there was no obligation so to do; and the proprietary agent *Peters* in 1765, and the proprietary board of property in 1768, decided against the indulgence, and restricted him to a quantity which would leave two hundred and twenty-five acres to the plaintiff. The verdict in the case is according to this decision.

It is reasonable to suppose that the claim of *Kyle*, who had also been a settler, or made some beginning of settlement, and was in the country at an early period, was the ground of restricting the survey, which might otherwise have been indulged. A survey of three hundred acres on each one hundred acre warrant, would be going on the ground of two improvements and settlements, which was the case here.

I feel a considerable revulsion at the conduct of a settler, who is not satisfied with defending himself against an intruder on his occupancy, but would exclude him from a reasonable vicinage, engrossing for himself more than he could pay for, and more than the usage of settlement would support. It is astonishing how early this grasp at an unequal distribution of property, even in a poor man, began to shew itself.

The verdict of early juries has great weight with me, but not sufficient to outweigh what appears to me very strong in this case.

I would have left the motion for the new trial to the Judges who sat on the trial; or at least would have been less willing to sanction the verdict, were it not that being brought before the court, though in the way of a *concilium*, it is but fair to the parties that my way of thinking be understood; in order that they may exercise their judgments in bringing it before me, or putting it off, at the holding of the next Circuit Court.

Rule absolute.