Tilghman C. T.
This cause has been long depending, J ° . and in various stages of its progress, has been several times before this Court. It is much to be regretted, that it hot long ago brought to a conclusion. All the material facts will be found accurately stated, in the case of Kyle's Lessee v. White, 1 Binn. 246. I will briefly mention such facts, as are necessary to elucidate the points of law to be now William White, deceased, was settled so early the year 1749, on part of the land in dispute, which had not then been purchased or the Indians. In the same year, Richard Peters, secretary 'of the Land office, went with some magistrates, to turn off those persons who had entered •on the Indian lands, of whom, White was one. White agreed to move off, in consideration of which, the secretary proxnisedhim, that as soon as the land should be purchased, place should be secured to him. James Kyle, also settled *108 on part of the land in dispute, prior to the purchase, and after White had commenced his settlement—but it does not appear, that he moved off voluntarily, or received any promjse from tjle Government, that his settlement should be secured to him. In the year 1754, the proprietaries purchased the Indian title ; and on the day of the opening of the Land Office for the sale of those lands, (3 February, 1755,) William White, obtained two warrants, for 100 acres each, one, to include his improvement, the other, to the northward of it, and to include part of the Big Meadow. On the 25th November, 1760, a survey on these two warrants was made by Colonel Armstrong, deputy surveyor, in one tract, containing 562 § acres, but according to a re-survey after-wards made by William Maclay, 673 acres. This survey was not returned till the 8th March, 1766. The delay of the return was accounted for, by the supposition, that the draft had been burnt, with the rest of Col. Armstrong’s papers, when his office was burnt in 1763, though it turned out, that this draft was not burnt. On the 17th May, 1762, Kyle entered a caveat against White’s large survey, and on the 3d June, 1762, he took out a warrant, for 100 acres, adjoining White’s land. William White was killed by the Indians about the year 1763. October 23d, 1765, Kyle took out another warrant for 200 acres, including his improvement, to pay interest from 1st March, 1755. July 20, 1768, two surveys were made for Kyle, on his two warrants, one, containing 106 acres, the other, 111 acres. June 30th, 1768, a hearing on Kyle’s caveat took place before the Board of Property j the parties, viz., Kyle and Mary White, widow of William White, appearing and producing their evidence—The board made a decision, by which, the land was divided between the parties, in the manner set forth in the decision'.
On the trial of this case, the plaintiff objected, that there ought to have been a struck jury, according to a rule entered, 16th April, 1801, but the Court overruled the objection, and ordered the trial to go on, to which the plaintiff excepted. There is nothing in this exception, because, after the entry of the rule, fora struck jury, the cause had been more than once tried by a general jury. This amounted to a waiver on the part of the plaintiff, of his rule for a struck jury, and if he wished the cause to be tried by such a jury, he ought to have obtained a new rule.
*109 The defendants objected to the decision of the Board of Property being given in evidence by the plaintiff, and they objected besides, specially, to the recital of facts mentioned in the decision, as introductory matter. This exception was never taken at any of the former trials of this cause, and it ought not now to have been taken. The reason assigned against the evidence, is, that the decision was ex parte, because, William White had conveyed all his right to John Calhoun, 16th April, 1755. This is a bad reason. The conveyance was not recorded, so that Kyle could not know of any person but William White, against whom he could enter a caveat. After the death of William White, his widow had a right of dower, and she appeared and made defence. It is highly probable, that Calhoun, knew of the caveat, and permitted the cause to go on, in the name of Mary White. But at all events, Kyle had a right to give evidence of all the proceedings in the land office, on which his survey was grounded, even though they were ex parte. These proceedings are not binding on the Courts of law. The Court and jury allow them no more weight, than in their judgment they are entitled to; and if they are ex parte, they deserve but little weight. The facts recited in the preamble to the decision, are not taken as proved, but it has been the uniform practice, to suffer the whole to be read, on trials at law.
Besides the errors complained of in these two bills of exceptions, the defendants allege, that there was error in the Answers of the Court to two propositions brought forward on their part.
1. The plaintiff’s warrant, called for White's land. Now, as it appears by the plaintiff’s caveat, entered before the issuing of his warrant, that he knew of White's survey; the defendants contend, that the call for White's land, is an acknowledgment of his title to all the land contained in the survey. This is an extraordinary argument indeed. The plaintiff had a caveat depending, against White's large survey, at the time he took out his warrant, and yet it is inferred, that by taking out the warrant, he gave up the caveat; as if calling for the land, and calling for the survey were the same thing. But nothing could be more different. The plaintiff knew, that White was entitled to some land, but thought him not entitled to the whole of his survey. By *110 calling for his land, therefore, he meant such land as the Board of Property should assign to him, on the hearing of the caveat, which he supposed would be a less quantity than that contained in the survey.
2. The defendants’ second proposition was this—“ That the two warrants to William White, on the 3d February, 1755, connected with the promise made to him by Secretary Peters, and the survey on these warrants in 1760, gave him a good title to all the land included in that survey, against all persons, except such as might have acquired some title, prior to the making of the survey on the said warrants.” To this, the Court answered, “ that the warrants and survey of White, would give title to all the land surveyed on them, if returned in a reasonable time, and accepted. But if the Proprietory Government conceived, that White, or any one claiming under him, had included an unreasonable quantity in the survey on those warrants, they might reject the unreasonable surplus, and might legally allow on the warrants, 438 acres, and grant the surplus to Kyle, if they thought fit, or to any other person who might have, or who might by them be supposed to have, any claim; and provided, they allowed to tha warrantee, all the land applied for, and described in his warrant, and the 10 per cent, surplus, they were not bound to allow him any more, unless by reason of the special promise of Secretary Peters, to White, of the extent of which, the jury are to judge.” This is indeed, very important question, though in my opinion, not a very difficult one. . What the law would have been, if the former proprietaries had retained the property of the soil, and the government of the State, it is difficult to say. Their influence would have been so great, that perhaps, they might have retained the controul over all titles, until they had divested themselves of their right, by issuing a patent. I can hardly suppose, however, that such would have been the case. But it is certain, that since the rights of soil and government have been vested in the Commonwealth, the courts of law, have established the principle, that where the proprietaries had adopted an official practice, in which the people were interested, they were bound by such practice, far, that they had no power, to annul or impair the rights persons who had made an express or implied contract for the taking up of land, while the practice was in force. In *111 many instances, this practice was so notorious, that the Courts now consider it as the law of the land, without putting suitors to the trouble of proving the existence of it. And considering the vast quantity of land, which remains still unpatented, and is held by title acquired under the proprietaries, it is of the utmost importance to the citizens of the Commonwealth, that the principle which the Courts have established, should be firmly supported. Prior to the year 1767, it had been the custom to pay very little regard to the quantity of land called for by the warrant, and to permit a survey of a much greater quantity, provided it had not been appropriated by some other person, before the survey made on the warrant. I think myself very safe in saying, that between 3 and 400 acres might have been taken up on a warrant for 100 acres. It appears, that upon the 13th April, 1767, the Governor being apprised of this practice, determined to alter it, and made an order, that no survey should be received, containing more than 10 per cent, above the quantity specified in the warrant or application. But he soon perceived the injustice of such an order with a retrospective operation, and therefore made a second order, on the 1st May, 1767, by which, after reciting, that it had been made known to him, by the representation of the surveyor general, “ that great numbers of surveys had been returned, both on warrants and applications, exceeding the quantities mentioned in the warrants and applications, and the 10 per cent., allowed the surveyors to exceed, and that to cut off, at that time, the excesses of those surveys, would, in a manner, put a stop to the business of the whole Province; therefore, as to what was past, the surveyor general should receive the returns of the said surveys, though they should exceed the quantities mentioned in the warrants or applications, and the 10 per cent.,” &c. &c. From the forcible language of this last order, we see, that the practice was very extensive, and the number of titles involved in it, very great; It was upon this practice, that the title of William White, was founded. But the Court of Common Pleas, were of opinion, that the Board of Property were not bound by it, but might, at their will and pleasure, cut off all the surplus, beyond the quantity called for by the warrant, and 10 per cent., in addition; although no other person had made application for any part of it, prior to White’s survey,—.It cannot be granted, that the *112 Board of Property possessed such uncontrouled power, without prostrating the system which the Courts have established with so much labour, and so much public adVantage# ft js not that the Board of Property were bound to accept the survey, without examining whether it was consistent with the rules of office; whether it contained too much front upon the river; whether it’s shape was as regular as the nature of the case admitted; whether any third person had acquired any kind of inceptive right, before the making of the survey: all these things might have been enquired into ; but it is denied, that the Board could refuse to accept the survey, merely because.it contained the quantity of 673 acres. This very point was decided by this Court, when they ordered a new trial in this cause once before ; I refer to 1 Binn. 246. And although the Court were not quite unanimous, (Judge Brackenridge dissenting,) yet it will be recollected, that among the three who denied the power of the Board of Property, were Judges Yeates and Smith, whose age and experience in the customs of the proprietary offices, (and particularly judge Smith, who had been a surveyor under the proprietaries,) were entitled to the greatest consideration. And the opinion held by this Court, is greatly strengthened, by two judgments in favour of White’s title, by the proprietary Judges, in the years 1770 and 1773. Upon the whole, I am of opinion, that upon this point, there was manifest error, and therefore, the judgment should be reversed, and a venire facias de novo awarded.
Gibson J., assented.
Duncan J., having been counsel for the plaintiffs in error, took no part in the decision.
Judgment reversed, and a venire facias de novo awarded.