# THE SUPREME COURT

OF

# PENNSYLVANIA.

WESTERN DISTRICT, SEPTEMBER TERM, 1842.

4ws 55
188 582

## Adams *against* Jackson.*

A settler, who makes his residence, by mistake or otherwise, on land previously appropriated, obtains no title, by settlement, to the adjoining land, over which he has cleared and cultivated and extended his enclosures.

But if he builds a house on the opposite side of the 400 acres of vacant land to his improvements and enclosures, which he lets to tenants, who reside therein with their families, so as to keep up a continuous residence, such residence may be connected with the vacant land cleared, enclosed and cultivated by him, so as to give him a pre-emption right to the same, including 400 acres, if there be so much.

A survey made in 1807, in pursuance of a warrant dated the same year, upon land described therein, for which the whole of the purchase money was paid to the State, and the surveying fees paid to the deputy-surveyor, who, in the same year, made out and forwarded a return thereof to the surveyor-general by a private person, who, as he testified, delivered the same to the surveyor-general, who, upon the receipt thereof, said it would not close, but no communication was made to the deputy-surveyor or the owner of the warrant of any objection to its acceptance, and in 1830 the deputy-surveyor being advised by one, who happened to inquire for the survey in the surveyor-general's office, that none was to be found there, made out immediately a second return, similar to the first, which was forwarded and accepted; *Held* that the owner of the warrant was not to blame, and that his right to the land was not affected by the failure to have the survey returned and accepted.

---

* This and the following case were argued at September Term 1841.

[Adams v. Jackson.]

If a deputy-surveyor, either through mistake or design, in returning a survey made by him, excludes part of the land included by him in running and marking the lines on the ground agreeably to the wish of the owner of the warrant, but returns it, without the knowledge of the owner according to other lines actually *run* and *marked on the ground,* it is the duty of the owner to apply for redress to the surveyor-general or the board of property within a reasonable time after he discovers the mistake or fraud of the deputy; otherwise he will be taken to have acquiesced in and be concluded by it, and not be permitted to controvert a right, acquired by another from the State, to the excluded land, whether acquired before or after his return.

ERROR to the Common Pleas of *Cambria* county.

This was an ejectment brought by Ignatius Adams, the plaintiff in error, against Henry Easton, Patrick Sommers, James Howell, Mary Conway, John H. Jones and William B. Thompson, tenants in possession, and Thomas Jackson, admitted afterwards to defend as landlord, the defendents in error, for the recovery of the possession of about 75 acres of land lying in Alleghany and Summerhill townships, in the county of Cambria. The plaintiff claimed under a warrant to himself, dated the 15th of January 1835, calling for 400 acres of land, including an actual settlement and improvement, adjoining lands of John Kunkle on the west, William Kinnear on the north, James Fenlon on the east, and lands of the heirs of John Blair on the south; interest to be paid on the purchase money from the 1st of September 1805; and a survey made by William O'Keefe, Esq., deputy-surveyor of the county, in pursuance of the warrant, on the 16th and 17th days of March 1835, containing 406 acres 91 perches. The purchase money for the 400 acres mentioned in the warrant appeared to have been paid on the same day as the date of the warrant. The warrant described the land surveyed under it.

The defendants, however, claimed only about 75 acres of it. To support their claim they gave in evidence the application of John Haines, dated the 9th of March 1807, for 75 acres of land on the waters of Conemaugh, in Cambria county, adjoining lands of James Kinnear and Robert Galbraith on the east, John Kunkle on the south, William Kinnear on the north, and of Brown and Harris on the west, including his improvement, consisting of a dwelling-house and five acres of clear land; interest to commence on the purchase money from the 1st of August 1801. The certificate of Luke Maguire and Eli Makenzie, that the application was proved before them, as justices of the peace, by James Maguire and Thomas Byrne, upon their solemn oaths, was also read in evidence. In the application the land was described as being first improved in the month of August 1801, and not before; and that grain had been raised thereon, consisting of different crops and kinds; and that a family was then actually residing upon it. Then the defendants read in evidence a warrant founded upon the application, dated the 18th of March 1807, for the 75 acres

therein described; a receipt also for the purchase money paid to the State of the same date; and a survey made in pursuance thereof by William O'Keefe, deputy-surveyor, dated the 4th of May 1807, containing 75 acres, corresponding, as he testified, with the land called for in the application and warrant.   Next a deed of John Haines, the warrantee, and his wife, dated the 12th of December 1834, conveying the 75 acres in fee to Peter Cassidy, for a sum of money, as the consideration, therein mentioned; and again a deed of Peter Cassidy, dated the 6th of July 1836, endorsed on the back of the deed last mentioned, immediately below one of the date of the 28th of March 1838, from the same to the same, conveying the same land to Thomas Jackson, one of the defendants, for the consideration therein specified.

William O'Keefe, the deputy-surveyor, was then called, who testified, after being sworn, that he was appointed deputy-surveyor in 1804, and continued to be such in 1807, when he made a survey on the Haines warrant on the 4th of May; and on the 8th of July following, 1807, he forwarded a return of the same to the surveyor-general, by James Meloy, and at the same time made the following endorsement on the warrant : " Surveyed 4th May 1807, returned July 8th, 1807." Then a certificate of the same survey, from the surveyor-general's office, was produced and read, dated the 5th of June 1830, endorsed " accepted 9th June 1830," accompanied by a negative certificate, that no previous return could be found in the land-office, of the Haines survey, upon search being made for it.   The testimony of James Meloy, the person by whom O'Keefe, the deputy-surveyor, forwarded a return of the survey made by him under the Haines warrant, as taken on a former trial of the cause, in writing, by Mr Magehan, one of the counsel, Meloy having died since that, was testified to by Mr Magehan, who stated that Meloy testified that William O'Keefe delivered to him the return of the survey of John Haines, with a request to deliver it to the surveyor-general at the land-office in Lancaster, in the fore part of the summer of 1807; that he accordingly delivered it to Mr Cochran, then surveyor-general, who handed it over to a Mr Whitesides, a clerk in the office; that Mr Whitesides, upon looking at it, said it would not close, and he therefore could not accept it.

William O'Keefe, being recalled, testified further, that for many years he did not know that the return of Haines's survey was not in the land-office; not until Michael Maguire, son of James L. Maguire, told him it was not there.   That in consequence of this he made a second return, with a note of the former circumstances, as previously stated by him.   That the surveying fees, as also the fees for returning the survey, were paid to him after the survey was made in 1807, or in the following year.   That he thought William Shaw lived on the land at the time the survey was made, but was not positive.   That there was a cabin house on it, and

IV. — 8

about three or four acres of it cleared. Thought he saw Shaw living on it; Shaw was along at the time of making the survey, and witness understood that he was a tenant to Haines, the warrantee. Witness continued to be deputy-surveyor until 1821 or 1822, when he went out of the office, and was again in it when he made the second return of the survey upon Haines's warrant.

Articles of agreement between James L. Maguire and John Haines, under their respective hands and seals, dated the 15th of August 1803, were read in evidence, by which Maguire granted and sold to Haines the 75 acres, in consideration of $40 paid in hand, the further sum of $17.50 to be paid when Maguire should make Haines a clear patent for the land, which was to be within two years from that date, and the further sum of $17.50 in one year thereafter. A receipt for the $40 was endorsed on the articles, and signed by Maguire. Michael Dodson, a witness for the defendants, testified that he saw William Shaw living on the 75 acres in 1806 or 1807; his impression was, however, that it was in 1807; that Shaw lived there for two years, and witness got coal of him. Shaw himself also testified that he went on the land in dispute, that is, the 75 acres, with his family, in 1803, under John Haines, and resided there with his family until 1808 or 1809; that a small spot was cleared when he went thither, and, during the time he resided thereon, he cleared about four acres more, raised oats, flax, buckwheat, potatoes, grass and corn on the same. That he had two children born, and that two died while he lived there. That in 1804 he commenced raising coal in the bank now claimed by the plaintiff, and worked the same until 1811. That Adams made no claim to the land while the witness lived on it, nor any other person, excepting Haines, with whom he had a verbal agreement to live on the land until he could build *a house at the coal-bank where he bought*, but never did build any there. Nor did Adams ever object to or forbid witness's raising coal and working the bank during the time he did so. John Haines also testified that he purchased the land of James L. Maguire by an article of agreement dated the 15th of August 1803; that the agreement was never cancelled or given up; nor the purchase money paid by him for it, restored; that when he purchased, he told William Shaw to move on it; and he did so, and lived there some considerable time; but cannot tell how long. He also told Cassidy to attend to it and take care of it for him, with his own land. When he bought of Maguire, about one-and-a-half acres of the land were cleared, and some more about half cleared. That witness never did relinquish his right to the land until he sold to Peter Cassidy; and never saw Maguire after he made the purchase of the land from him.

The plaintiff, for the purpose of showing that he acquired a preemption right to the land within his survey, adduced a number of witnesses, some of whom testified that as early as 1805, he made

[Adams v. Jackson.]

a small improvement on it by clearing about half an acre, not more, on the coal-bank hill, in which he sowed rye, and reaped it in 1806; that he resided, at this time, at another improvement, about three-quarters of a mile from the coal-bank; which is not included within the boundaries of his survey of 406 acres 91 perches; though some of his witnesses spoke of his having a cabin at the coal-bank as early as 1805; some in 1808; and others in 1810.   Patrick Burk, however, testified, that he built a cabin at the coal-bank, for Adams, the plaintiff, between 1815 and 1818; that there was no other cabin there then, nor clearing of any kind, and no appearance that there ever had been any.   The cabin built by Burk was 16 or 18 feet square.   Adams then lived at what has been called the Sharp Place, since that, where his sister kept house for him.   The cabin built by Burk was put up for the use of the coal-bank; and, according to some of the witnesses, Adams occasionally slept there on straw, with hands employed by him to dig coal; and their food cooked elsewhere and brought thither to them. From the most of the testimony given by the plaintiff's own witnesses, it appeared clearly, that he never resided at or near the coal-bank before 1822, when he had a house built near thereto by Jacob Weaver, but on land warranted and surveyed in the name of James Kinnear, as early as 1788, where he resided about two years.   Here he cleared and cultivated 20 acres or upwards, two of which were on the Kinnear tract, where he had his dwelling, and the residue within the lines of his survey made under his warrant of 1835.   In 1823 he erected a house within the limits of this survey, on or near the turnpike-road, where he resided a short time, part of a year or so, and then leased it for a tavern, after which it was occupied as such some two or three years, when it was destroyed by fire.   Previously, however, to the erection of this last house, he had a cabin erected and three or four acres of land cleared at the same place; all, perhaps, within his survey under his warrant of the 15th of January 1835.   This cabin might possibly have been erected as early as 1817, about the time the construction of the turnpike-road was going on; but its erection did not appear to have been of so early a date, from the evidence; nor did it appear, with certainty, when it was first erected.   Tenants, however, lived in it under Adams, both before and after the erection of the house at the same place in 1823.   During the time this latter house was occupied as a tavern, or at least the greater portion of it, the cabin was used as a school-house.   But on no part of the 406 acres 91 perches claimed by Adams under his warrant of the 15th of January 1835, did it appear that he or any tenant under him, ever resided prior to the year 1817.   Some of his witnesses, indeed, who seemed not to have been acquainted with the boundaries and precise location of the 406 acres 91 perches, spoke of his having resided thereon before that time; but others, who were acquainted with the boundaries, proved clearly

that his residence, where he had any previously to that time, was upon other land.

Other evidence was then given by the defendants, going to show that Adams, in March 1830, bought three land warrants of Peter Cassidy, as the agent of Abraham Kerns, which had been taken out for lands that could not be obtained, in March 1794; the first in the name of Jeremiah John; the second in the name of James John, and the third in the name of Josiah John. In September 1830 he had a survey made of lands on each of these warrants, the aggregate of which amounted to 1264 acres, in which was included all the land embraced within his survey made afterwards, under his warrant of the 15th of January 1835, excepting the 75 acres surveyed under the Haines warrant, which he left out, upon being told that it was so surveyed and appropriated. In 1831 these surveys were returned into the land-office and accepted. One of the chain-carriers, however, testified, on behalf of the plaintiff, that the plaintiff objected to the 75 acres being left out; that he insisted upon their being included, until the surveyor at length told him he would take them in, though in this he was most positively contradicted by the surveyor. The surveys, however, as returned, excluded the 75 acres. A great deal of other testimony, on both sides, was given, which it is unnecessary to detail or notice, as the opinion of the court, and its application to the case, will be fully understood without it.

The court below, among other things, charged the jury, that " in regard to the coal-bank improvement, much evidence had been given, and there were many contradictions among the witnesses. There is evidence that Adams commenced an improvement and built a cabin there in 1805; and there is evidence that in 1815 or 1816, there was no residence or improvement there; but some things concerning the coal-bank are undisputed. It is an undisputed fact, that in the fall of 1822 Adams built a house at the coal-bank, which, from that time at least, was the only place of residence which he or any of his tenants had on this improvement. It is also an undisputed fact that this house, and the only residence of Adams or his tenants at the coal-bank, is upon the tract of land appropriated in the name of James Kinnear. The defendants have shown a warrant to James Kinnear of the 20th of December 1784, for 400 acres of land, and a survey made thereon of 346 acres and 12 perches, on the 25th of June 1788: and James Magehan swears that Adams's house is within the lines of this survey; that about two acres of the improvement are also within the lines of this survey, and some 18 acres are without these lines. It is thus established that whatever residence on vacant lands Adams may have had at the coal-bank, was abandoned in 1822, and has never been resumed since. Applying now the principles of law which have been explained, it is apparent to you that Adams had no legal "*settlement*" at the coal-bank. There was no *residence*

[Adams v. Jackson.]

and occupation, and we have seen that a bare improvement, without residence, gives no right. The residence was on appropriated land, in respect to which he could acquire no rights as a settler. He had no residence on the unappropriated land, and therefore, on the 15th of January 1835, when Adams took his warrant, he had no such settlement and improvement as his warrant calls for."

"Next, in regard to the improvement at the burnt tavern, (that is, at the turnpike-road). The evidence in regard to Adams's possession at this place, is very unsatisfactory up to the year 1823. His changes of residence were so frequent, and there is so much discrepancy among the witnesses, that it will probably be difficult for you to find that he had such a settlement as the law requires at the burnt tavern, prior to 1823. At that date the evidence becomes more consistent and specific. Jacob Weaver says the tavern was built in 1823; and James Magehan says that a man by the name of Bruce lived in a cabin near the burnt tavern, and that it was built *before* the tavern, and that it has been occupied ever since by persons whom the witness understood were tenants of Adams. Matthew M. Adams says this Bruce cabin was occupied as a school-house at one time, prior to the burning of the tavern, but since the tavern was burnt, he says the cabin and improvement have been kept up by his father's tenants; that four or five acres were cleared and fenced; oats were raised by Joseph Shrum, and potatoes, and that the fences have been kept up, and the fields pastured and mowed. The tavern was burnt in 1826, and Adams has continued to live in the house on the James Kinnear tract, except in 1836, when he sold to Judge Shaler and moved to Loretta for a short time."

"Now, was this a settlement according to the legal principles already explained? It is contended by the defendants that Adams's living on the James Kinnear tract, and claiming that tract by virtue of his possession, cannot appropriate to himself, *as a settler*, the possession of his tenants at the burnt tavern; but if he can, that then there must be such a resident settlement by the tenants as the law requires. It is impossible that the tenants can have the *intention* necessary to be associated with residence. They cannot have the manifest intention of making it a place of permanent abode, and the permanent means of supplying their families, nor can they have the intention of ultimately paying the commonwealth for the land. They are tenants only, and an intention to make it a place of *permanent* abode would be an intention to defraud the landlord. To sustain such a settlement it is necessary to consider the residence of the tenant as the residence of the landlord, and then to infer that the necessary intention pertains to the landlord. I will not say that a man cannot in any case acquire a pre-emption right to land by virtue of the possession of a tenant; but in this case I would say, that the presumption seems to be more reasonable that Adams intended to appropriate the

[Adams v. Jackson.]

James Kinnear tract by his possession, than to make the improvement at the burnt tavern a place of permanent abode. He could claim the James Kinnear tract only by his possession, for he has shown no title, and he has had the possession, almost long enough, of that tract, to acquire a title to it under the Statute of Limitations. No leases to his tenants, at the burnt tavern, have been shown, and there is no evidence of rent received, nor of any considerable extension of the improvements, since 1823. All we know about it is, that Magehan and Matthew Adams understood the occupiers to be tenants of Adams. Are you satisfied, from all the evidence, that Adams intended to make that settlement his place of permanent abode, and the permanent means of supporting his family? The policy, under which this species of title was supported, was to encourage the poorer classes, who were not able to pay for land, and were yet willing to make a tract their home, and bestow the labour of themselves and families upon it. This policy would be frustrated to allow one to hold land as a settler, who resided elsewhere, and would enable him to monopolize many parcels of territory without conferring the benefits of his personal industry. *Sergeant's Land Law* 140. This question of residence is for you, and it is for you to inquire whether it was associated with such *intention*, on the part of Adams, as, under the law of pre-emption, would give him a right as a settler. The residence of Adams on the Kinnear tract, adversely to the owner, does not satisfactorily indicate the requisite intention, but rather indicates an intention inconsistent with that required for a settlement right. But the question of residence, its extent and character is left to you to decide, under the evidence, on the principles of law which have been explained. But the plaintiffs contend that the 16 or 18 acres of land, improved over the Kinnear line, at the coal-bank, are to be considered in connexion with this residence in the cabin at the burnt tavern. But that part of the coal-bank improvement is totally disconnected from the residence at the burnt tavern, and has no residence on it. The tenants of the cabin have had no possession of that part of the coal-bank improvement. Adams had the occupancy without residence, and it is not possible, in opposition to the facts in evidence, to consider this as a part of the residence at the cabin of Adams's tenants. The eighth point, propounded by the plaintiffs, is correct on the facts of it therein assumed, but under the facts in evidence the court say that Adams's occupancy of several acres of improved land at the coal-bank, cannot aid or apply to the residence of his tenants at the burnt tavern. The former part of our observations in regard to this residence of the tenants, answers the fifth point proposed by the plaintiffs.

"If, from all the evidence, you should not believe that Adams had a settlement right at the burnt tavern on or before the 9th of June 1830, he cannot recover, and your verdict should be for defendants. But if you should find such a settlement, the opinion

[Adams v. Jackson.]

of the court is, that up to that day the 75 acres in dispute were open to settlement or survey; and if Adams, having acquired a pre-emption right by a legal settlement, designated his boundaries and included the land in dispute, he would be entitled to recover it."

"To explain the views of the court clearly on this part of the case, it is necessary to look into the title set up for the defendants. It is founded on a warrant of 18th of March 1807, granted to John Haines, and surveyed on the 4th of May 1807. This warrant calls for an improvement commencing 1st of August 1801. And here the plaintiffs have interposed the following proposition. "That if the jury believe, from the evidence, that no person resided on the 75 acres on the 18th of March 1807, or that no grain was raised thereon previous to that date, the taking out of the warrant in the name of John Haines, of that date, was a fraud on the officers of the commonwealth, and conferred no title on John Haines or those claiming under him." This is correct in point of principle; but if the evidence of Cassidy, M'Gough, Dodson, John Adams, Haines and Shaw be believed, there was a possession of the 75 acres, with improvement and residence. And O'Keefe says, when he made the survey of this warrant, Shaw was in possession; and Shaw proves that he went into possession in 1803, and left it in 1808 or 1809, after having improved about 4 acres. This warrant, therefore, was well located on the 75 acres, and, under the evidence, we deny the doctrine of the plaintiff's first point."

"But it was the duty of Maguire or Haines to have the warrant returned within a reasonable time. They attempted to do this, but O'Keefe, the surveyor, sent the survey to the office in Lancaster by one James Meloy, (now dead, but whose evidence on a former trial is proved). Meloy, stated that the clerk, to whom the survey was delivered, made the calculation, and it would not close, and they could not accept it. From that day to this, the survey has not been heard of in the land-office, and the evidence of possession, when the warrant was surveyed, is not more positive than is the evidence that the possession was abandoned from 1809 or 1811. Maguire was bound to have the survey returned, and if it was so defectively returned as not to be acceptable at the land-office, he should have had it perfected and returned. In the condition in which it was left, he might abandon his title, and, referring again to the legal principles laid down already, we feel bound to say to you, as a matter of law, that there was a complete abandonment of this Haines claim from the time Shaw left the possession until the 9th of June 1830, when the Haines survey was accepted at the land-office. Before that period this land was open to the settlement or warrant of any other settler or applicant; and this answers substantially the second, fourth, fifth and seventh propositions of the plaintiff."

[Adams v. Jackson.]

" The 8th point made by the defendants, is denied by the obser-
vations made. And as to their 9th point, we consider the evidence
of abandonment not only powerful enough to justify you to pre-
sume it, but to require us to declare it an abandonment as a
matter of law. On the 9th of June 1830, the Haines survey
was returned and accepted; and the rights of Haines became
vested, which he subsequently conveyed to Cassidy, who con-
veyed to Jackson. From that date, the defendants derive a title
perfect on its face, and in itself perfectly valid. Before that date,
had Adams acquired any right in the 75 acres? His warrant,
you remember, was in 1835. Before the 9th of June 1830, he
had acquired no paper right. Had he acquired a right by settle-
ment? By settlement, if at all. And thus you see the import-
ance of ascertaining whether Adams had the right of a settler
prior to that date. Adams never had any possession of the 75
acres; and we have seen that he had no residence and settlement,
except it was at the burnt tavern. I repeat, if you are not satis-
fied that he had a settlement at that place, the plaintiff cannot
recover; but if you should be satisfied that he had, this question
presents itself for your consideration. Did Adams comprehend
the 75 acres within his claim? If you believe Cassidy and
William Lake, Adams did not claim them in 1823, for he then
defined his boundaries by lines marked on Cassidy's draft, which
excluded both the 75 acres and the burnt tavern improvement.
To the same effect is the evidence of David Davis, who proves
Adams's disclaimer of the 75 acres in 1819 or 1820. It is competent
for a party, claiming as a settler, to limit and define his claim by
lines on the ground; and when he has done so, and others have
acquired rights in the land excluded by the settler, he is con-
cluded by his boundaries, and cannot affect the rights which have
intervened. If, therefore, you believe that before 1830, Adams
defined his claim by lines on the ground, excluding the 75 acres,
he cannot now turn upon Jackson, and take from him the title he
has acquired to the 75 acres. It would be a fraud on Jackson to
suffer this to be done, and would involve a prostration of all prin-
ciples of law and justice."

" But again: If Adams had the possession and settlement which
could confer title, he could take a warrant for the whole or part
of the land claimed by him, or he could apply to his claim any
warrant already issued, which had not been previously applied
elsewhere. It has been shown that, on the 17th of March 1830,
the plaintiff purchased of Peter Cassidy three lost warrants, in
the names of Jeremiah John, James John, and Josiah John, each
for 400 acres of land; and that these several warrants were
located for the plaintiff, and in his presence, on the 2d of Septem-
ber 1830. These warrants were certainly located and returned
so as to exclude the 75 acres in dispute; and the presumption of
law is, that they were located and returned agreeably to the

[Adams v. Jackson.]

wishes of the proprietor; and if they were not located and returned by his consent, and in a manner satisfactory to him, he should have complained to the surveyor-general, and obtained the order of the board of property for a re-survey, or a different return. And this legal presumption is greatly strengthened by the fact, which you will bear in mind, that when these surveys were made, this land had been appropriated on the warrant of Haines; and it was the duty of the surveyor to exclude it, or to note this interference on his survey. He made the survey, excluding the 75 acres, and returned his work to O'Keefe, the official surveyor, who made return thereof into the land-office, where it has remained unaltered ever since. Now, if you should be of opinion that Adams had a settlement at the burnt tavern, and that, up to the time of the survey of these Johns warrants, he included the 75 acres within his claim, you will observe that he took up that settlement and improvement by the survey of the James John warrant. It did not exist, then, for the purposes of his warrant of 1835, and could impart no value to that warrant. That warrant was inoperative as to this improvement, and as to all the lands surveyed within the lines of the Johns warrants; as to them it was a nullity, it conferred no title at its date, its survey, or its return; and the 75 acres were the only lands open for it, and that previously appropriated by the plaintiff's own surveys. But the 75 acres had been appropriated to the Haines warrant on the 9th of June 1830, so that there was nothing left for the Adams warrant of 1835 to take. His settlement, which you may find, did not help this warrant, for that settlement was already appropriated to the Johns warrants. Circumstanced in this manner, it is perfectly clear that the plaintiff cannot recover the 75 acres. He alleges that he was deceived as to the survey of the Johns warrants; that he intended they should include the 75 acres, and he supposed they did; and there is some reason afforded in the evidence for believing that he was defrauded in the survey and return of these warrants. But if he was, his remedy did not consist in taking a new warrant, and bringing his ejectment; but he should have procured a re-survey of the Johns warrants, and then brought his ejectment; and this, we think, is his remedy still. On this trial, we cannot alter the lines of the Johns surveys. They are on the ground, and in the land-office; and we must take them as they are, until the plaintiff procures the alteration he desires, by competent authority. Thus far he has acquiesced in them as they are established, in that he has not sought for their alteration by the competent authority; and as they are established, the law is so, that he cannot recover the 75 acres in dispute, and your verdict must be for the defendants."

The jury accordingly gave a verdict for the defendants, upon which the court rendered a judgment. The charge of the court

IV. — 9                    F *

[Adams v. Jackson.]

was excepted to by both parties; and the following errors were assigned by the plaintiffs:—

1. The court erred in charging the jury that the plaintiff's improvement at the coal-bank was not a legal settlement.

2. In that part of their charge which relates to the improvement at the burnt tavern; particularly when it is laid down as a requisite to the legality of his settlement, that he must have intended that settlement as *his* permanent place of abode, and permanent means of supplying *his* family; and that it would be against the policy of the law, to allow one to hold land as a settler, who resides elsewhere.

3. In charging the jury that Adams's occupancy of the cleared land at the coal-bank improvement, which was not within the lines of the James Kinnear survey, could not aid or apply to the residence of his tenants at the burnt tavern.

4. In their remarks about the survey made by Cassidy in 1823, and about the residence of David Davis, and their silence about the survey made by Magehan in 1826, because calculated to mislead the jury in both matters of law and fact.

5. In their positive charge to the jury, that their verdict must be for the defendants, because of the survey in the warrant in the name of James John.

*Black* and *Banks*, for plaintiff in error, in support of the first error, contended that the testimony of several witnesses showed that the plaintiff had an improvement and settlement at the coal-bank as early as 1805; and that it was kept up there, by himself or his tenants, till 1822, at least. That although the residence there might be said to have been changed at that time, through mistake, by building the dwelling-house, then erected, on land previously warranted and surveyed in the name of James Kinnear, say about two rods over the line, yet, if that be material, a residence on the land existed at that time, and was kept up continuously afterwards by tenants of the plaintiff, in a cabin then in being, and a house built afterwards, at the place subsequently called the Burnt Tavern. This question of fact ought to have been submitted by the court to the jury; but it was erroneously withdrawn from them.

2. The clearing of the land, and other improvements made and continued by Adams on the vacant part of his claim, after he removed over on the Kinnear tract, should have been referred to the jury, in connection with the residence of his tenants at the burnt tavern, to decide whether the same did not constitute an actual settlement. The residence of the plaintiff's tenants at the burnt tavern was his own residence, in contemplation of law; the 20 or 30 acres, cleared at the coal-bank, were cleared by himself; they were also cultivated, and grain raised thereon by himself; so that all that was requisite to constitute a settlement, and

[Adams v. Jackson.]

give a pre-emption right to the land in dispute, was done by him.

3. The general doctrine, that a settler is concluded by his own designation of his boundary, if others have acquired rights before he attempts to change or alter it, may be true, but is not applicable to this case, because Adams extended his boundaries before any other right to the land had been acquired. The court, therefore, erred in laying down the general rule as applicable to this case.

4. It has been the universal understanding of the profession, and ever recognised by all the courts of the State, that a man might gain a pre-emption right to land by the settlement and improvement of his tenant; yet the court, in effect, instructed the jury to the contrary, and therefore erred.

5. The survey, as returned for Adams on the James John warrant, excluding the land in controversy, ought not to preclude him from recovering it, because it was actually included by the survey as made on the ground, but fraudulently left out by the surveyor, in his return to the surveyor-general, without letting Adams know of it. This fraud was practised by Peter Cassidy, who was the owner of the adverse title, under the Haines warrant, at the time this action was instituted. Jackson, who now claims to be the owner of the land by virtue of the Haines warrant, having become so by a deed from Cassidy long after the institution of this suit, and during its pendency, cannot be regarded as in any better situation than Cassidy, because the pendency of the action was sufficient to affect him with notice of the plaintiff's claim to the land, when he bought of Cassidy. The defendant cannot set up a fraudulent return of the survey made by himself against the plaintiff, in order to preclude the latter from showing that the survey, as made on the ground, actually included the land in dispute. In such case an application to the board of property for a re-survey was unnecessary. The court, therefore, erred in their instruction to the jury, in this respect.

*Miles* and *Magehan*, for the defendants in error.

1st error. It is clear from the evidence, that although Adams may have had a shanty or shelter for workmen employed by him, at the coal-bank, in raising coal, he never had a dwelling-house or residence there, either in person or by tenants. His nearest dwelling to it was on the Kinnear tract; but this was not built before 1822. Nor did it give any right of pre-emption to the vacant land around the coal-bank, because it was erected on land previously appropriated by warrant and survey. *Overton* v. *Gibson*, (2 *Watts* 384). Hence there is nothing in the first error.

2d, 3d. The plaintiff's counsel, on the trial in the court below, finding that they could not sustain the pretended settlement and improvement at the coal-bank, resorted to the improvement and residence at the burnt tavern, on the turnpike, at the extreme

[Adams v. Jackson.]

corner of the tract surveyed under the plaintiff's warrant of the
15th of January 1835. To constitute a settlement, it must, ac-
cording to the Act of Assembly, be a personal resident settlement
on the land, made with a manifest intention of making it a place
of abode and means of supporting a family; and continued from
time to time, unless interrupted by the enemy, or *by going into the
military service of this country during the war.* It is the *inten-
tion of the settler*, connected with his acts, or those caused by him,
which gives to them the character of a settlement. But in this
case, it is manifest that the plaintiff considered his residence on
the Kinnear tract, as that which was to secure to him a pre-emp-
tion right to the land in dispute, and that he could have had no
such intention with respect to the residence by means of tenants
at the turnpike-road or burnt tavern; which latter would seem to
have been made, at first, for temporary purposes merely. Whether
it was so, however, or not, was submitted as a question of fact to
the jury, to be determined by them; and the court merely told the
jury, if they should find that the plaintiff's intention of making a
personal residence on the land was confined to that made on the
Kinnear tract, the residence of his tenants at the burnt tavern was
not sufficient to give him a pre-emption right to the land in dis-
pute. The court went no further than this, and did not instruct
the jury, as is alleged, that a settlement could not be made by
means of tenants residing upon the land and improving it.

4th. It is not alleged here that the court gave any positive
instruction to the jury that was erroneous; but that it did not
make any remarks to them in regard to the survey of 1826, sworn
to by Magehan. Magehan testified it was only an exploring
survey, and therefore required no remarks from the court. Besides,
it is clear that Magehan did not consider that survey a designation
of the land claimed by Adams, otherwise he behaved dishonestly,
for he afterwards, in 1828, sold the 75 acres to Jackson. But the
judgment will not be reversed because the court did not make all
the remarks which the nature of the case would have admitted of
to the jury. 2 *Serg. & Rawle* 397, 401; 14 *Ibid.* 377.

5th. This is an exception to the charge of the court directing
the jury that their verdict must be for the defendants, because the
survey made for the plaintiff, in 1831, under the James John war-
rant, included the coal-bank and his improvement made there, as
also his improvement and settlement made at the turnpike or burnt
tavern, but, as returned into the surveyor-general's office, excluded
the 75 acres or land in dispute; thus precluding himself, thereafter,
from claiming it by virtue of the settlement upon which he pro-
fesses now to base his warrant of the 15th of January 1835. In
this direction the court was correct; for it cannot be questioned
that the title to the land in controversy became perfect in 1830,
under the Haines warrant, when the survey made in pursuance
of it was returned to and accepted by the surveyor-general, unless

[Adams v. Jackson.]

the plaintiff's settlement stood in its way; but the plaintiff, in the following year, by his survey under the James John warrant, as returned into the surveyor-general's office, designating the land which he claimed by virtue of his settlement, excluded the land surveyed under the Haines warrant. If the survey made on the ground, under the James John warrant, for the plaintiff, was not truly returned into the surveyor-general's office, that is, did not include the land in controversy, when it ought to have included it, the plaintiff, as the court below told the jury, ought, when he ascertained that it was not included in the return, to have applied to the surveyor-general of the board of property, and thus have had the return corrected. But having omitted to do this, he cannot make the objection in this action, which is instituted by himself, and have the correction made by a jury. It was his duty first to have made his application to the surveyor-general, or board of property, for that purpose. 2 *Yeates* 88; 3 *Serg. & Rawle* 346, 350; 5 *Serg. & Rawle* 187; 4 *Yeates* 107, 108; 2 *Binn.* 69, 70; 14 *Serg. & Rawle* 377. Besides, Jackson is a *bonâ fide* purchaser of the land, under the Haines warrant, for a valuable consideration, without any notice whatever of the fraud alleged to have been practised by Cassidy in making the return, under the James John warrant, for the plaintiff; and therefore cannot be affected by it, supposing the fraud were committed, as alleged. 4 *Serg. & Rawle* 352; 14 *Ibid.* 377; *Cresson* v. *Miller*, (2 *Watts* 272). But even a correction of the survey, under the James John warrant, will give no validity to the plaintiff's warrant of the 15th of January 1835; nor can his survey, under this latter warrant, correct the error of the deputy-surveyor in making the return upon the James John warrant. The court was therefore right in directing the jury to find a verdict for the defendants.

The opinion of the Court was delivered by

KENNEDY, J. — The very point presented by the first error assigned, was decided by this court in *Overton* v. *Gibson*, (2 *Watts* 384), that a settler who makes his residence, by mistake or otherwise, on land previously appropriated, obtains no title, by settlement, to the adjoining land over which he has cleared and cultivated, and extended his inclosures. The instruction given by the court below to the jury, appears to be in exact accordance with the principles laid down and established by this court in the case cited: the instruction given, is therefore correct.

The second and third errors assigned, may be considered together, as they relate to the same matter. That part of the charge of the court here excepted to, is in the following words: " But the plaintiff's counsel contend that 16 or 18 acres of land improved over the Kinnear line by himself, at the coal-bank, are to be considered in connection with the residence of his tenants in the cabin at the burnt tavern. But that part of the coal-bank improvement

[Adams v. Jackson.]

is totally disconnected from the residence at the burnt tavern, and has no residence on it. The tenants of the cabin have had no possession of that part of the coal-bank improvement. Adams had the occupancy without residence; and it is not possible, in opposition to the facts in evidence, to consider this as a part of the residence at the cabin of Adams's tenants. The 8th point propounded by the plaintiff's counsel, is correct on the facts therein assumed; but, under the facts in evidence, the court say that Adams's occupancy of several acres of improved land, at the coal-bank, cannot aid or apply to the residence of his tenants at the burnt tavern."

Although the charge, in general, is correct, and shows no inconsiderable degree of discrimination and knowledge on the subject of our land laws, yet it appears to us that the learned Judge, in the part just recited, has restricted the rights of a settler, arising from the improvements made by him and his tenants, within limits that would seem to be too narrow to answer the ordinary purposes of life, and at the same time provide against losses, which may readily occur through mistake, without doing injury to the rights of others. We can perceive no good reason why the settler should not have the benefit of a clearing, fencing, and cultivating of land, made by himself personally on one side of the tract contiguous to his residence, notwithstanding it be on other land previously appropriated, so as to connect the same with a dwelling-house put up by him on the opposite side of the vacant land, intended to be secured by settlement, and a residence therein by his tenants; and thus render the settlement complete, and secure to him a preemption right to all the vacant land so improved; provided the quantity do not exceed 400 acres, and the form or figure of the tract be reasonable. The intention of the settler, in such case, to secure the tract by settlement, must be considered as extending to the whole of it; and it is wholly immaterial to the State, whether he obtain it upon the residence of his tenants, in connection with the improvements made by himself personally, or upon his own personal residence, and the improvements made by himself. The residence of the plaintiff in this case, established, by means of his tenants, at the turnpike, does not appear, from the evidence, to have been for a mere temporary purpose, unconnected with his obtaining a right for the land; but would rather seem to have been done with a view to making it a place of permanent residence for his tenants at least, if not for himself; and whether he resided there in person, or by his tenants, was, as has been observed already, a matter of perfect indifference to the State; for the interest of the State was alike promoted by the residence of the one or the other, if kept up continuously. His first building, as a dwelling, at the turnpike, was a cabin, probably erected about 1817, which was occupied as a dwelling until he put up, at the same place, a more costly house, and much larger one;

[Adams v. Jackson.]

which he let as a dwelling-house, and in which his tenants resided with their families, and kept tavern until it was destroyed by fire. The cabin, which, during the existence of the tavern-house, had been occupied as a school-house, was again let by the plaintiff to tenants as a dwelling-house, who resided therein with their respective families. So it would seem as if he had been intent upon keeping a continuous and permanent residence at this place. We therefore think that the land which he had cleared, fenced, and cultivated, near to the coal-bank, or to his personal residence on the Kinnear survey, might well be joined with the improvements made by him at the turnpike, and the residence of his tenants there, for the purpose of rendering his settlement on the land perfect; and that the court erred in advising the jury otherwise. There is nothing in the fourth assignment of error; nor was it pressed on the argument.

The fifth and last error assigned is an exception to the conclusion of the charge, in which his Honour, the President Judge, instructed the jury that the plaintiff could not recover the 75 acres in dispute, and that their verdict must be for the defendants. In order to decide correctly on this direction of the court to the jury, it becomes necessary to take a review of the titles to the land, as they appeared in evidence, under which the parties respectively claimed; and if it should, from the evidence, appear clearly and indubitably that the title exhibited by the defendants was superior to that exhibited on the part of the plaintiff, then the court was right in giving the instruction complained of. I think it cannot be questioned that the evidence went to prove, clearly, that the title under which the defendants claimed, was commenced by an improvement on the land in dispute as early as 1801; that a cabin, suitable for the habitation of man, was erected upon it in 1803, into which William Shaw, in the same year, moved with his family as a tenant under John Haines, and resided there with his family until 1808 or 1809, during which period he cleared and fenced about four acres of the land, and cultivated the same by growing oats, flax, buckwheat, potatoes, grass and corn thereon; on the 18th of March 1807, while he was residing on the land as the tenant of Haines, James Maguire, of whom Haines purchased the land, with a covenant that Maguire should procure an office-title for it, took out a warrant describing it, for which he paid to the State the purchase money on the same day; and had a survey made thereon in the May following, by the deputy-surveyor, who received his surveying-fees, and made a return of the survey, in the course of the summer or autumn of that year, to the surveyor-general, by a James Meloy, who, as he testified, delivered it to the surveyor-general, when something was said about its not closing. The deputy-surveyor, having thus returned the survey, believed, as also Haines or Maguire, who acted for Haines in the matter, that it was returned, accepted and placed on file in the surveyor-gene-

[Adams v. Jackson.]

ral's office until 1830, when the deputy was informed by a son of Maguire, that no such survey could be found in the surveyor-general's office. The deputy, therefore, made out and forwarded a second return immediately to the surveyor-general, which was received and accepted by the latter on the 9th of June 1830. The plaintiff, according to the evidence, grounded his claim upon an improvement commenced in 1805, upon land near to that in dispute, at the coal-bank, which consisted of a clearing of not more than half-an-acre, sowing it in rye, and the erection of a sort of cabin, used as a shelter from the changes of the weather, for hands employed by him in digging coal at the bank, in which, perhaps, they slept occasionally upon straw, and ate their food, when cooked elsewhere and brought to them. But, according to the great weight of the plaintiff's own evidence, it was never occupied as a dwelling or residence by any one. The plaintiff, at that time, was a single man, and it would seem to be somewhat doubtful where he had his residence then, or whether he had any at any place. If he had any at all, it was most probably at another improvement, which he had, and sold afterwards to a person of the name of Sharp, as mentioned by some of his witnesses; or it may be, that he had no fixed residence, for Samuel Short, one of his own witnesses, said he had *four* several improvements, which he described by locating them severally, and added, after doing so, " I cannot tell where his home was—rambling, as he was, I cannot tell." Some years afterwards, however, but how many does not distinctly appear, he built a house upon a tract of land previously appropriated by a survey under a warrant in the name of James Kinnear, where he resided, and cleared and enclosed and cultivated twenty acres or upwards, about eighteen of which were upon the vacant land including the coal-bank. But previously to 1815 it does not appear, from any of his evidence that can be relied on, that he had a residence either by himself or by his tenants on the vacant land, with which he now wishes to connect the land in dispute. From 1816 or 1817 it would rather appear that the plaintiff had such a residence as might be sufficient to give him a pre-emption right to 400 acres of land then unappropriated, if there were so much there. In 1835, on the 15th of January, he took out a warrant for 400 acres, calling for his improvement, including the coal-bank, agreeing to pay interest on the purchase money to the State from the 1st of September 1805, upon which he had a survey made and returned in March of the same year; which survey included the 75 acres in dispute.

The defendants also, then, in order to show that the plaintiff ought not to derive any benefit from his settlement, to the land in contest, under his warrant of the 15th of January 1835, beside the title exhibited by them under the Haines warrant, and the settlement upon which it was founded, showed that the plaintiff, by an agreement made the 17th of March 1830, with Peter Cas-

[Adams v. Jackson.]

sidy, as the agent of Abraham Kerns, purchased three unsatisfied or lost warrants, calling for 400 acres each, in the names severally of Jeremiah John, James John and Josiah John, bearing date the 12th of March 1794. That the plaintiff had, on the 2d of September 1830, surveys made on these warrants by the deputy-surveyor of 'the district, who returned the same to the surveyor-general; two of which, that is, the surveys made on the Jeremiah John and James John warrants, were accepted on the 18th of May 1831, and the survey on the Josiah John warrant the 12th of December of the same year. That the survey so made, returned and accepted under the James John warrant, contained 352 acres 47 perches, and included the settlement and all the improvements of the plaintiff, embraced within his survey made afterwards under his warrant of the 15th of January 1835, but excluded the 75 acres in dispute. That the plaintiff took a deed of conveyance from Abraham Kerns, dated the 30th of September 1830, for the three Johns warrants and the lands surveyed under them. But the plaintiff, for the purpose of showing that he was deceived in regard to the survey as returned under the James John warrant, and was dissatisfied with it, called a Daniel Walters, who testified, " that he was one of the chain-carriers when Peter Cassidy, who acted for the deputy-surveyor of the district, made the surveys for the plaintiff in 1830, (meaning the Johns surveys), and that in running the lines, when they came to the 75 acres, Cassidy stopped, told Adams, the plaintiff, here are the lines of the 75 acres, and that he could not hold it; Adams, in reply, said: " Cassidy, if you don't run the 75 acres in, I shall not accept of your warrants;" they disputed a considerable time, and finally Cassidy agreed to run it in; Adams said, " you must run it in, for it 's my property;" he did run it in, and Cassidy pronounced the lines " closed." Adams also, further, with a view to show his dissatisfaction with the survey, as returned on the James John warrant, called a Cornelius M'Donald to prove that on the 5th of October 1831, Abraham Kerns and the plaintiff, by agreement, erased, in the deed of the former conveying the Johns warrants and the surveys made thereon to the latter, the part which described the survey made under the James John warrant as conveyed with the warrant, though the witness could not tell for what purpose or reason the erasure was made. Daniel Walters, however, was contradicted, in the evidence he gave, by Peter Cassidy, the surveyor, in the most direct and positive terms, by his testifying that Adams, upon being told by him (Cassidy) that the 75 acres were surveyed and appropriated under the Haines warrant, and that he (Adams) could not take it into his survey, then about being made under the Johns warrant, or hold it if he did, agreed expressly that it should not be included; and accordingly it was excluded by running and marking the lines around the 350 acres 47 perches, as returned into the surveyor-general's office.

IV. — 10                           G

[Adams v. Jackson.]

Under this state of the evidence, the President Judge in the court below directed the jury, that although Haines had the first right to the land in dispute, by virtue of his prior settlement, warrant and survey, yet because no return of his survey was to be found in the surveyor-general's office before the 9th of June 1830, he must be considered in law as having abandoned his right so acquired. In this direction we think his Honour erred, as it was not owing to any default on the part of Haines, that the survey was not to be found in the surveyor-general's office within a reasonable time after it was made. The deputy-surveyor, who was the agent of the State, having received his fees for making and returning the survey, was bound to make the return, and to see that it was received in the surveyor-general's office. Haines had no control or power over the deputy, in this respect, whatever; being the agent of the State, he was under the direction of the State alone; and it would be most extraordinary indeed if Haines, who was the vendee of the land, should be prejudiced or have his right to the land affected by the neglect or want of a proper degree of vigilance on the part of the deputy-surveyor, the agent of the vendor, over whom the vendee has no authority whatever. To permit the State, after having received the whole of the purchase money for the land from the first vendee, as she did from Haines, in this case, to sell and grant it to another, because her agent, the deputy-surveyor, had not returned the survey made for the first vendee, after he was bound to do so, within a reasonable time, or having returned it, because it is mislaid or lost and therefore cannot be found in the office, would be permitting the State to take advantage of her own wrong; which would not only be repugnant to every principle of justice, but would shock the common sense of even the meanest capacity. Chief Justice Tilghman, in *Lilly* v. *Paschal*, (2 *Serg. & Rawle* 398), in speaking of the *application* there, under which the defendants claimed, which was only loosely descriptive of the land in dispute, says; " on such an application, according to the opinion of the court in *Lowman's Lessee* v. *Thomas*, (4 *Binn.* 51), the title would date from the *making of the survey*, unless there should be such subsequent misconduct on the part of the applicant as would forfeit his preference. What would amount to such misconduct, I will not now consider; but it must be *his own* misconduct; for he could not be injured by the misconduct of the *deputy-surveyor.*"

And Mr Justice Yeates, in the same case, page 400, says; " it is of the utmost importance to the community, that the rules governing the titles of lands should be fixed and permanent. These rules, as to taking up lands under *applications*, are correctly laid down by the Chief Justice in *Lowman's Lessee* v. *Thomas*, in 1811, (4 *Binn.* 51). They accurately conform to a variety of decisions wherein I have been present and joined, and are bottomed on principles of sound law, moral honesty and public convenience.

[Adams v. Jackson.]

Suppose a person possessed of a large landed property, offering it. for sale in distinct tracts. One wishing to purchase a particular tract applies for it in such words as designate the object of his wishes, and are confined to one spot, and adheres to his contract with due diligence, performing all his relative duties; his right necessarily takes effect from the *time of his application.* Should his application be couched in such vague and loose terms as may fairly include several tracts, without violence to his language, and the person entrusted by the *vendor* to admeasure the tract reduces it to a certainty, *by a survey,* his right takes effect from *such appropriation.* The contract *then* becomes defined and complete, and binds the *original owner.* The *negligence of the surveyor,* in not making a proper return to *his constituent,* ought not to be visited on the *purchaser* of the land, who has no control over his nomination; and it must be a *very strong* case of *gross* negligence *under peculiar circumstances,* on the part of the *applier,* before I would hold him affected by *official misconduct of the deputy-surveyor,* in not acting up to his instructions. In the case of an application, which, in its execution, is located on different grounds than those applied for, it is obvious, that there being no previous contract for the particular lands, it can only be validated by subsequent consent."

So in *Boyles* v. *Kelly,* (10 *Serg. & Rawle* 217), the present Chief Justice, in delivering the opinion of the court, declares, " it is laid down that the title to the specific land surveyed on an indescriptive location or warrant commences from the date of the survey, and the owner of it shall not be prejudiced by the *neglect* of the *deputy* to *return* the survey; making the distinction, however, as to a *shifted location,* because the title did not attach until it was returned, except as against a party who had actual notice of the survey." See also *Kyle* v. *White,* (1 *Binn.* 246); *Bond* v. *Stroup,* (3 *Binn.* 66); *Vickroy* v. *Skelley,* (14 *Serg. & Rawle* 377); and the earlier cases of *Drinker* v. *Holliday,* (2 *Yeates* 88); and *Meade* v. *Haymaker,* (3 *Yeates* 67), in which the same doctrine is laid down, established and reiterated without any equivocation.

If, then, it be the rule, as all the cases already referred to show it most unquestionably is, that the right of an owner of an *indescriptive* application, upon which *no* part of the purchase money has been paid to the State, attaches to the land surveyed under it from the date of the survey, and that the neglect of the deputy-surveyor to return the survey, after he has received his fees, shall not prejudice the right of the owner of the warrant to the land, how much stronger must be the case exhibited here on the part of the defendants, where the whole of the purchase money was paid to the State at the time of granting the warrant under which they claim, which is *descriptive* of the land surveyed under it, and the deputy-surveyor was paid his fees for surveying and making return thereof! In this latter case the right of the owner of the warrant

[Adams v. Jackson.]

to the land, commenced from its date, before any survey was made; and could a doubt have been raised as to its being precisely descriptive of the land, so as to give a right thereto from its date, the survey removed all possible doubt as to its having been not only commenced, but rendered perfect and absolute from the date of the settlement, say 1801, upon which the warrant was founded, whether the survey was returned afterwards or not by the deputy-surveyor. The survey being made upon the land described in the warrant, and not exceeding the quantity therein mentioned by the deputy-surveyor, as the agent of the State, who was paid his fees for making the survey, was such an execution of the contract for the purchase of the land included in the survey, as bound the State, and vested an absolute and indefeasible right thereto in John Haines, the warrantee. The State thereafter had no right remaining in the land to grant or sell to any one; and it would have been contrary to every principle of honesty, knowingly, to have done so. The surveyor-general was also bound to receive and accept the survey, unless an error could have been shown in it, which would have affected the right of the State or that of some other person; and if such existed, it was the duty of the surveyor-general, and not that of Haines, the owner of the warrant, to have had it corrected without delay. There was no good ground whatever for imputing default or neglect of any kind to the warrantee, for it is clear, from the evidence, that he did all that could be required of him by law, either as regarded his duty and obligation to the State or as to third persons. He had paid the State the purchase money in full for the land, so that it had no further claim against him; and by having his survey made and the lines of it marked on the ground, he had also done all that the law required for the purpose of giving notice of his right to the specific land included within his survey; so that every person, disposed thereafter to buy land of the State, might have full knowledge of his right. Every such person was bound to take notice of it, without any return of the survey being made into the surveyor-general's office; and in this consists, as we have seen from the authorities cited above, the great difference between a survey made under a descriptive or indescriptive warrant, and a survey made under one that is shifted; in the latter case the survey is not considered notice to any person, unless he has actual notice before of its having been made, until it shall have been returned into the surveyor-general's office; whereas in the former cases, if the warrant be not precisely descriptive of the land, so as to render its application certain without a survey, the survey on the ground makes it so to all intents and purposes, and every person is bound, at his peril, to take notice of its location, whether a return be made of it or not.

The doctrine here laid down is also consistent with the principle upon which the late cases of *Chambers* v. *Mifflin*, (1 *Penn. Rep.*

[Adams v. Jackson.]

74); *Addleman* v. *Masterson*, (*Ibid.* 454); and *Star* v. *Bradford*, 2 *Penn. Rep.* 394). In the first of these cases, the party claiming under the prior warrant and survey was postponed, because he failed to pay the deputy-surveyor his fees for making the survey, so as to make it the duty of the latter to return it, before the survey made and returned on the subsequent warrant, under which the other party claimed the land. It was therefore owing entirely to the neglect of the owner of the prior warrant and survey, that he failed to recover the land under it. So in the second case, the application and survey of the defendant, though prior in date to the warrant and survey of the plaintiff, was considered as having been abandoned by him, because he had neglected or refused to pay the deputy-surveyor his fees for making the survey, so as to make it his duty to return the survey before the plaintiff obtained his warrant and return of survey under it. And likewise, in the third case, the defendant, who claimed under an application and survey made long before the date of the defendant's warrant and survey, was held not entitled to hold the land, because he failed to show that he had paid the deputy-surveyor the surveying-fees, so as to entitle him to have a return of the survey made, which was not returned, nor possession of the land taken under it, until after the plaintiff had obtained a warrant, survey and patent for the land. The decisions of these cases, therefore, are in perfect accordance with all the previous decisions and the doctrine contained in them, though it may be that things are said in some of them seemingly not altogether so. The only case to be found, which would seem to militate, in the least, against the generally established doctrine and former decisions on this subject, is that of *Zerbe* v. *Schall*, (4 *Watts* 138), where the defendant claimed under an *application* dated the 8th of April 1767, but whether descriptive of the land or not does not appear, and a survey made in the same year, by the deputy-surveyor, which he never returned, though paid his surveying-fees; nor was any return made of it until the 4th of July 1814, 47 years after it was first made, when it was returned by a subsequent deputy-surveyor. Nor was possession of the land taken by the defendant before 1830, when he prevailed on the tenant of the plaintiff to let him have it. The plaintiff claimed under an improvement commenced on the land in 1830, 33 years after the date of the defendant's survey, which was followed up by obtaining a warrant for the same and a survey thereof, and finally a patent from the State in 1828; and held by this court that the plaintiff was entitled to recover the land, on the ground, that after so great a lapse of time, the defendant must be considered in law as having abandoned his claim to the land. If the application of the defendant was not *shifted*, I would say that his survey, made on the ground, called for by it, was notice to all the world of its having been made; but as he had paid no part of the purchase money to the State for the land, the right to it still

[Adams v. Jackson.]

remained in the State, and the contract for the purchase never having been even executed in part by him, or closed in such a way as to bind him to pay for the land, and he never having come forward either to pay or to have his survey returned, that he might pay or be compelled to do so, and never having taken possession of the land for so great a length of time, the State had a right to say that he had abandoned his *application,* and therefore she had a right to grant or sell the land to any one disposed to buy, the same as an ordinary vendor would have had under like circumstances. So that this case bears very little, if any analogy to the one under consideration, where the State had, in reality, transferred all her right in the land to Haines, by receiving the purchase money and granting to him a warrant for it, upon which he procured the deputy-surveyor to make a survey, and paid him his fees for so doing, whereupon the latter forwarded a return of the survey so made, to the surveyor-general, who, it was believed, had received and accepted the same. So that, in truth, no negligence would seem to have been imputable to any one, at least not to the owner of the warrant; and certainly still less ground to presume an abandonment by him of his title to the land, which had become absolute and perfect. A perfect title may be lost under the operation of the Statute of Limitations, but it cannot be presumed to have been abandoned by the owner; nor would his declarations, that he had abandoned it, have such an effect, except in favour of one who had taken possession of the land and expended his money and labour upon it on the faith of such declarations, so as to make it a fraud to take the land from him afterwards. Had the jury been instructed by the court below, that such was the law on this part of the case, it is difficult, if not almost impossible, to believe that they would have hesitated a moment in finding a verdict for the defendants; for all the evidence on the part of the defendants, as also the weight of the plaintiff's own evidence, went to prove, that the title under which the defendants claimed was older and better than that of the plaintiff. But still, seeing this view of the case involves in it questions of fact, which the jury alone must decide, however clear the evidence may be in regard to them, we cannot therefore upon this ground affirm the judgment in favour of the defendants, though perfectly satisfied that they are entitled to hold the land upon it, even if they had no other.

It now remains to consider the validity of the particular ground upon which the court instructed the jury, that their verdict must be for the defendants. This ground was, that the plaintiff having had a survey made and returned by the deputy-surveyor of the district, under a warrant in the name of James John, excluding the land in dispute, but including the land whereon his settlement, as also all his improvements were made, which he alleged to have been the origin of his title, under which he claimed the land in question, thereby abandoned his claim to it, if he had any by

[Adams v. Jackson.]

virtue of his settlement, provided the survey as returned was made by his consent, either expressed or implied; but if otherwise, it was his duty, within a reasonable time after he discovered the fraud or mistake committed, as he alleged, by the deputy-surveyor, in leaving the land in contest out of the survey as returned, without the consent or knowledge of him, the plaintiff, when it had in fact been included in the survey, as made on the ground, to have applied to the surveyor-general or board of property for an order to have the error corrected by means of a re-survey or true return thereof; but having failed to do this, it must be taken, that if he did not consent to it at the time, he had since acquiesced in it, and was therefore precluded from having it corrected by the jury under the direction of the court. In order to show that the court erred in their instruction to the jury on this point, the counsel for the plaintiff have cited and relied on the cases of *Caufman* v. *The Cedar Spring Congregation,* (6 *Binn.* 59); *Blair* v. *M'Kee,* (6 *Serg. & Rawle* 193); *Bryson* v. *Hower,* (8 *Serg. & Rawle* 409); and *Merchant* v. *Millison,* (3 *Yeates* 73). In the first of these cases the defendants in error were the plaintiffs below, and claimed under a descriptive application and survey made on the ground, including the land in dispute, which was, however, excluded by the deputy-surveyor in his return to the surveyor-general, without the consent or knowledge of the owner of the application; whereupon another person, at the instance of the deputy, entered an application, and got a return of survey of the land for himself; this court held that the latter return of survey did not prejudice the elder proprietor or benefit the younger; and that the elder was entitled to recover the land, though no application had been made by him to the surveyor-general or board of property to have the error in the return of the survey corrected. In the second case, where the plaintiff claimed in the court below under a warrant of 360 acres, dated in 1790, calling for an improvement made in 1775, and a survey made thereon of 695 acres of land within the purchase of 1768, but never returned, it was held, that although he could not recover the 695 acres, yet he was entitled to recover against a subsequent warrant, survey and possession, as much thereof as he had a right to have included in his survey at the time it was made; and that the jury might ascertain and designate the same by a diagram, to be annexed to their verdict. In the third case, where the board of property, at the request of the owner of an application and survey, under which the plaintiff below claimed, issued an order of re-survey, for the purpose of ascertaining how far the tract was interfered with by other surveys belonging to the same individual, and the deputy-surveyor, by mistake or design left out a small portion of it, to which another person shortly after applied a warrant and obtained a patent five years afterwards, it was ruled that the plaintiff was entitled to recover the land so left out, without any application to the surveyor-general or the board of

[Adams v. Jackson.]

property. And in the last case, the defendant in the court below was held by this court entitled to hold the land claimed by the plaintiff, which was included in the survey of the defendant, as made on the ground, but thrown out without his knowledge or consent by the deputy-surveyor in his return thereof to the surveyor-general, though he never made any application to the surveyor-general or the board of property to have the error of the deputy corrected.

But in support of the opinion of the court below on the point under consideration, various authorities have been referred to. In *Drinker* v. *Holliday*, (2 *Yeates* 88, 89), it is laid down, " that every survey will be presumed to be made by the consent of the applicant or warrantee, unless the contrary appear; and where his dissent does appear, he must make an *early* complaint to the surveyor-general, or in his default to the board of property. If he is remiss herein, his negligence will operate strongly against him, and, under many circumstances, he will be supposed to have abandoned his objections to the survey. When a survey has been completed on the ground and returned, a new survey cannot be made without new directions, because the authority of the deputy-surveyor has been determined." In *Hunter* v. *Meason*, (4 *Yeates* 108), it is also said, " if a survey be made with which the owner of the warrant is dissatisfied, he should *without delay* complain to the surveyor-general or board of property, and pray for redress, otherwise the survey will *conclude* him." Again in *Miles* v. *Potter*, (2 *Binn.* 69, 70), where a survey had been made and returned by the deputy-surveyor upon land different from that called for by the defendant's warrant, but without his consent, as it would seem, this court say, " it was not in the power of the deputy to make any alteration in the survey, after it was returned by him, without a new authority from the land-office;" and although this new authority was obtained, yet, because it was not had as soon as the error was discovered, and before the plaintiff's right attached to the land, it was too late, and the defendant thereby lost his right to it. In *Healy* v. *Moul*, (5 *Serg. & Rawle* 181), it is laid down by Mr Justice Duncan, in delivering the opinion of this court, that " when the survey is returned the deputy is *functus officii*, and it requires a new authority from the surveyor-general or board of property to warrant an alteration. 2 *Smith's Laws* 255. The presumption of law is that the survey has been made by the owner's consent; but if he be dissatisfied, he should *without delay* complain to the surveyor-general or board of property, and pray for redress; otherwise the survey will *conclude* him." This doctrine is afterwards recognised and laid down by the late Chief Justice of this court, in delivering its opinion in *Vickroy* v. *Skelley*, (4 *Serg. & Rawle* 377), who, after stating that the title, under a shifted application, does not commence until the return of the survey, excepting as against one who has *notice* of it before the

[Adams v. Jackson.]

return, and then it commences from the *time of notice;* for which he cites *Kyle* v. *White*, (1 *Binn.* 246); *Bond* v. *Stroup*, (3 *Binn.* 66), proceeds and adds, " there is little or no difference between an *altered* and a *new* survey. There is certainly no difference as to the commonwealth, and as to *third* persons, they are *protected*. If *they* have *appropriated* the land, *they* will *hold* it *against* either an *altered* or a *new* survey." And in a previous case, *Deal and Weir* v. *M'Cormick*, (3 *Serg. & Rawle* 346), the present Chief Justice says, " the law is well settled, that after a survey made and returned into the office, a second survey, without an order of the board of property, is *void*. If the owner of a warrant be *prejudiced* by the *fraud* or *mistake* of the officer, the board of property will grant him relief, if no new right has attached to the land." In the same case Mr Justice Duncan, on the same point, which was an exception to the charge of the court below, instructing the jury that a second survey, shown to have been made under the plaintiff's warrant, without any order of re-survey obtained first for that purpose from the surveyor-general or the board of property, was irregular and *void*, says; " I do not see any just cause of complaint on the part of the defendant to this part of the charge; for the court submitted it to the jury to decide, whether the first survey was *fraudulently* made by the deputy-surveyor, with an intention to deprive the owner of his just right; and if the jury find it was *unfairly* made, then the court say, the owner, if he complains *within a reasonable time* of the injury done him, is *not bound by it*. I cannot see anything that would be a greater inducement to fraud, in the management of several warrants held by the same person, than to suffer the owner of the survey returned to shift it on other lands, of his own mere motion, without an order or direction from the surveyor-general or board of property, under the pretence, that though the survey was made and returned for him, yet it was returned on a warrant not intended. Surely, if this is to be rectified, it should be done in *some reasonable* time, and *by application to some proper authority*. His warrant, by the survey and return, is *functus officii*. The command of the surveyor-general to his deputy, to execute and make return, has been obeyed; the authority of the deputy has been executed; his power is at an end; such has been the course of decisions." For which he cites *Drinker* v. *Holliday*, (2 *Smith's Laws* 255); *Hunter* v. *Meason*, (*Ibid.* 256); and in a late case, *Oyster* v. *Bellas*, (2 *Watts* 397), this doctrine was carried so far as to be applied to what was called a second survey, made after a return of a chamber survey; that is, a survey made on paper merely by the deputy-surveyor, without his going on the ground, as required by law, which was, therefore, of no validity whatever, yet the second survey, though made by the deputy's going on the ground and actually running and marking the lines of it, was held void and of no validity whatever by this court, because made

IV. — 11

[Adams v. Jackson.]

without an order of re-survey from the surveyor-general or the board of property.

Now it may not be improper to notice a difference between the case before us and the cases of *Kauffman* v. *The Cedar Spring Congregation*, &c., relied on by the counsel for the plaintiff. In the case before us, the lines of the survey, as returned for the plaintiff, excluding the land in dispute, were *marked on the ground*, for so they appeared to the witnesses who examined them, and therefore were not made merely by protraction on paper, as was done in the cases relied on by the plaintiff. In them it may have been thought that the lines marked on the ground were to be considered according to the general rule laid down on the subject, as the real lines of the surveys, notwithstanding the lines, as returned on the drafts, were different; but this rule can only be properly applied where it would seem to have been the intention of the surveyor to make the lines marked on the ground the real boundaries of the survey. But certainly there may be a difference in regard to the effect that is likely to be produced on the minds of third persons in the two classes of cases, as to the real extent of the boundaries of the survey; for in a case like the present, where lines, corresponding with those set forth in the return of the survey, are found marked on the ground, there is but one conclusion to be drawn, which is, that they were intended, and must be considered as the true boundaries of the survey returned. And hence third persons are justified in treating them as such, and have a right to purchase of the State the lands without the lines called for in the return of the survey, if not otherwise appropriated. And, therefore, the necessity was increased in this case, as well as the propriety of the plaintiff's applying to the surveyor-general or the board of property *without delay*, as soon as he discovered the alleged fraud of the deputy-surveyor, in order to have it corrected and set right. He, according to his own showing, knew of it as early as October 1831, for then, as his counsel allege, he had the alteration in the deed of Abraham Kerns, whereby the three warrants, in the names severally of Jeremiah John, James John and Josiah John, were conveyed to him, made, because the survey executed for him under the James John warrant was not truly returned, and did not include the land in dispute. His procuring the alteration, however, to be made in this deed was not calculated to produce any alteration or correction in the return of the survey on the James John warrant; nor was it calculated to advise the State or any other person of it; even the witness who attested the alteration, did not know the reason or the occasion of making it. John Haines, who then claimed the land in question under his warrant and survey, had certainly a right to consider himself as the owner of the land, freed, at least, from all claim on the part of the plaintiff. After this, however, the plaintiff still lies by until January 1835, when he takes out his warrant

[Adams v. Jackson.]

of 400 acres, upon which he had a survey made in March following, including the land in dispute, and also the most of the land, though not all, included in his survey on the James John warrant. This was certainly a novel, if not a very injudicious proceeding on his part; because it was throwing away all the money which he paid to the commonwealth for the warrant, excepting what he paid for that part of the land not previously embraced in the surveys made under the Haines and Johns warrants. This last warrant taken out by the plaintiff, and the survey made under it, could not have the effect of an order of re-survey on the James John warrant, and a survey made in pursuance thereof; so that the survey returned on the James John warrant remained as it was before; and the plaintiff having had that survey made for himself as the owner of the warrant, and having included in the return thereof all the land upon which he had made his settlement and improvements, thereby concluded himself, according to the principles and doctrine of the late, as also many of the early cases, from extending his claim, in virtue of his settlement, beyond the boundaries returned on the James John warrant, because he had acquiesced in, if he did not consent to that return as made, without ever having complained to the surveyor-general or the board of property, or applied to the same in any way for redress. But even if he had made application for an order of re-survey, when he took out his warrant in January 1835, instead of taking it, it would certainly have been too late. It ought to be done *without delay,* say some of the cases, and others say, within a *reasonable time.* But this would have been upwards of three years after he acquired a knowledge of the fraud he now complains of; a period exceeding greatly what was requisite to enable him to make the application. Public policy, and a due regard to the administration of justice, require that the application to the surveyor-general or the board of property should be made as early as convenient after the mistake or the fraud shall have come to the knowledge of the party. When a fraud or mistake is alleged to have been committed by the deputy-surveyor, either in making or returning the survey, it is due to him as well as to all whose rights may be affected by it; and justice certainly requires that he should have the earliest opportunity that can be afforded, of showing that it is untrue; for whether it be charged against him as a mistake, or the result of design, either is calculated to injure his character as an officer, and the sooner he has an opportunity of showing his innocence and the falsity of the charge, the better able he will be, if charged wrongfully, to do so; for lapse of time may remove his witnesses, or eradicate from their memories what would have been abundantly sufficient to have acquitted him. Beside, he may die in the mean time, and the party whose interests are to be affected by the establishment of the fraud or mistake of the deputy, may, by reason thereof, be rendered unable to show that the mistake or

[Adams v. Jackson.]

fraud was not committed. In order to prevent fraud from being effected, either by means of perjury or mistake arising from the frailty of human memory, it is essentially necessary that frauds or mistakes alleged to have been committed, and especially those which go to affect titles or rights to real estate, and are such as can only be established or repelled by parol evidence, should be complained of to the proper authority without any unnecessary delay; so that the matter may be inquired into and settled according to the truth of the case, while the witnesses are to be had, and before what they did know in relation to the subject has escaped from their recollections.

It is easy to imagine that great injustice may arise, if owners of warrants, after they have had their surveys made and returned, shall be permitted to lie by for years, and then to come forward and have their boundaries extended beyond those returned, by giving parol evidence to prove that the deputy-surveyors, either through design or mistake, did not set forth the true boundaries in the returns made by them. Take, for instance, the present case, where the plaintiff avoided, for years, taking a single step to have the ground of his complaint inquired into and settled, and until only one of the chain-carriers present at the survey, is to be had, who is procured by the plaintiff to testify, that in making the survey on the ground, after a dispute between the plaintiff and Peter Cassidy, acting for the deputy-surveyor, about taking in the land in question, Cassidy, who refused at first, at length agreed to include the land in the survey then being made by him for the plaintiff, and accordingly did so, by running around it with the compass and chain, taking at the same time the courses and distances thereof. In all this, however, he is positively and expressly contradicted by Cassidy, who was produced as a witness on behalf of the defendants, and shown even by the son of the plaintiff, called as a witness for his father, on his cross-examination, to have testified differently on a former trial of the cause before arbitrators, from what he did then before the jury; particularly in saying, on his former examination, that the survey made by Cassidy for the plaintiff, of the land in contest, closed at a *poplar* corner, which, if true, could not have included it, but, on the contrary, must have excluded it, a thing capable of being proved by the most irrefragable testimony; because the poplar corner, as it seems, being somewhat notorious, and its position such as to show, most clearly, by the testimony of other witnesses on both sides, that if the survey was closed at it, the land in dispute could not have been included in the survey as made on the ground, but in conformity to the return made thereof by the deputy-surveyor. The son of the plaintiff, though he testified to the discrepancy of the evidence given by the chain-carrier on the two trials, volunteered an apology for him, that he thought it was because he was confused from the *severity* of the cross-examination. And indeed it

[Adams v. Jackson.]

is not unreasonable to suppose, that if the other chain-carrier could have been adduced as a witness, the attempt to fix the charge of fraud on the surveyor would not have been attempted. It may also be observed, that this case is different, in one respect, from some of those relied on for the plaintiff; here the deputy-surveyor or Cassidy, who acted for him, does not appear to have had any private interest or advantage in view, to be gained by his leaving the land in question out of the plaintiff's survey. But his duty required him, as the land·had been long previously granted and surveyed by the State to Haines, not to survey it again for another. The fact of its having been previously granted and surveyed to Haines was known, at the time, to Adams, ·the plaintiff, and if he wished to contest the right of Haines, it was his duty to have applied to the surveyor-general or the board of property for a special order on the subject, and not to have contented himself with getting the deputy-surveyor to survey and return the land for him. In order, therefore, that truth and justice may prevail, it would seem to be of the utmost importance to the public, as well as to the individuals directly concerned, that there should be an established rule on the subject, which shall be adhered to, where such errors are alleged to have been committed by deputy-surveyors, whether real or pretended, requiring the party complaining that he is aggrieved thereby, to make application at least within a reasonable time after the matter has come to his knowledge, for redress, to the surveyor-general or board of property; otherwise he will be taken to have acquiesced therein, and be concluded. Thus all objections to the titles of lands, on such account, will be speedily removed, and the owners thereof induced to proceed with confidence in the improvement of them, whereby the public interest, as well as their own individual interests, may be greatly promoted and advanced. The adoption of this rule, and a steady adherence to it, are rendered still more necessary and proper, when we consider the progressive state of improvement that exists in regard to lands generally in the State, and especially those in respect to which such objections are most likely to arise. After a careful and deliberate consideration, we are satisfied that the rule is sustained both by principles of justice and expediency; that in its operation it will deal equally with all, and impose hardships upon none. We therefore think that by force of this rule, and application of it to this case, the court below were right in directing the jury that their verdict ought to be in favour of the defendants.

Judgment affirmed.